UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| MERCK SHARP & DOHME CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 11-51-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| JACK CONWAY, in his Official Capacity | ) | **MEMORANDUM OPINION** |
| as Attorney General of the Commonwealth | ) | **AND ORDER** |
| of Kentucky, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court for consideration of Plaintiff Merck Sharp & Dohme Corporation's ("Merck") motion for a preliminary injunction. [Record No. 2] Merck asserts that Kentucky Attorney General Jack Conway (the "AG" or "Kentucky AG") violated its right to due process when he retained outside counsel on a contingency fee basis to aid in the prosecution of Merck under the Kentucky Consumer Protection Act ("KCPA"). [Record No. 1]  For the reasons discussed below, the Court will deny Merck's motion.

## I.    Background

This matter arose from Merck's marketing and distribution activities involving the prescription medication Vioxx.  The AG filed suit against Merck on September 28, 2009, pursuant to the KCPA, located in Chapter 367 of the Kentucky Revised Statutes ("KRS"). [Record No. 2-1, p. 7]  The complaint alleges that "Merck has willfully engaged in acts and practices which are unfair, false, misleading and/or deceptive and has committed acts or practices

in trade or commerce in violation of KRS 367.170." [Record No. 2-2 ¶ 34] The requested relief includes civil penalties of "two thousand dollars ($2,000) for each violation of KRS 367.170, and ten thousand dollars ($10,000) for each violation targeted to consumers over the age of 65." [*Id.*, p. 8] These amounts represent the maximum civil penalties recoverable under the KCPA. *See* KRS § 367.990(2). The AG filed the complaint in the Franklin Circuit Court; however, the case was removed to this Court on October 30, 2009. [Civil Action No. 3: 09-54, Record No. 1] The case was then transferred to the Eastern District of Louisiana on April 15, 2010, as part of the multidistrict litigation ("MDL") captioned *In re Vioxx Product Liability Litigation*, MDL No. 1657. [Civil Action No. 3: 09-54, Record No. 15]

Approximately one year into the action, the AG retained outside counsel to assist with the Vioxx litigation. [*Id.*, p. 3] On July 28, 2010, the AG "issued a Request for Proposals," and a panel reviewed the six proposals that were submitted. [Record No. 15, p. 7] Thereafter, on September 30, 2010, the AG entered into a contract with the firm Garmer & Prather, PLLC. [Record No. 2-3] The contract was approved by Governor Steven L. Beshear through Executive Order 2010-823. [*Id.*, p. 1; Record No. 15, p. 7] Under the contract, the firm agreed to be compensated by contingency fees "to be withheld from any settlement award resulting from th[e] litigation." [Record No. 2-3, p. 3]

Garmer & Prather agreed to "assist the [Office of the Attorney General (OAG)] with investigation and potential litigation involving **Merck & Co. Inc.**, manufacturer of the pharmaceutical drug Vioxx and any other potentially liable parties." [*Id.*, p. 5] The contract contains the following relevant provisions:

-2-

Legal services will include, but may not be limited to:

> Performing an assessment of the OAG's proposed litigation against **Merck & Co. Inc.**
>
> Assuming lead role in investigating and, if warranted, preparing litigation against Merck & Co. Inc. and other potentially responsible entities, if any. [The AG] will conduct all phases of investigation and litigation including responding to motions, including motions to dismiss;
>
> . . . [D]rafting and answering discovery propounded to the Commonwealth; tracking documents obtained in discovery; coordinat[ing] litigation with other states and the federal government to promote, to the extent beneficial, a unified approach to these cases; taking of depositions; defending depositions noticed by the defendants; preparing Commonwealth witnesses for depositions; responding to motions for summary judgment or other pretrial dispositive motions; identification of experts to testify in favor of the Commonwealth; preparation of expert witnesses for deposition or trial testimony; assessing the strength of legal arguments propounded by the litigants; preparation of legal arguments on motions; dealing with discovery disputes; represent the Commonwealth in trial or in any settlement negotiations that may occur; represent the Commonwealth in responding to post-trial motions; represent the Commonwealth in the appeal of any judgment or verdict rendered in any such action(s) and, if applicable, the remand from appeal(s).

[*Id.*, pp. 5-6]  Importantly, the agreement also provides:

> The OAG retains the right at all times to direct the litigation in all respects, including but not limited to, whether and when to initiate litigation, against whom actions will be taken, the claims to be made in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested.

[*Id.*, p. 5 (emphasis omitted)]

Merck filed the instant action against the AG on August 16, 2011, seeking a declaratory judgment and injunctive relief.  [Record No. 1]  In its complaint, Merck alleges that the AG has

-3-

"delegated [its coercive powers] to private lawyers having a clear, direct and substantial financial stake in the outcome of *Commonwealth ex rel. Conway v. Merck & Co., Inc.*, a punitive enforcement action that must be prosecuted in the public interest or not at all." [*Id.* ¶ 29] As a result, Merck asserts, its "right to due process under the Fourteenth Amendment has been infringed." [*Id.* ¶ 30] Merck filed its motion for a preliminary injunction on August 16, 2011.[1] [Record No. 2] The Court held a scheduling conference on September 13, 2011, during which the parties indicated that a motion to remand was under advisement in the Eastern District of Louisiana and that a ruling was imminent. [Record No. 27, pp. 6, 10] On January 3, 2012, the District Court for the Eastern District of Louisiana remanded the action to the Franklin Circuit Court. *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2012 WL 10552, at *14 (E.D. La. Jan. 3, 2012). Merck moved for permission to appeal the decision, but that motion was denied on February 24, 2012. *See In Re: Vioxx Prods. Liab.*, No. 12-90002 (5th Cir. 2012).

## II.     The Standard for a Preliminary Injunction

A preliminary injunction is an extraordinary equitable measure. It has been characterized as "one of the most drastic tools in the arsenal of judicial remedies." *Am. Civ. Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 444 (6th Cir. 2003) (internal quotation marks and citation omitted). For this reason, it should not be extended to cases which are doubtful or do not come within well-established principles of law. *See id.* The Sixth Circuit has identified the following factors to be considered in evaluating a motion for injunctive relief: (1) the likelihood

---

1       Merck did not move the Court for a hearing on the motion, nor did it request a hearing in the motion itself. [*See* Record Nos. 2, 2-1] A hearing was contemplated at the scheduling conference, but both parties have sought to delay the hearing at different times, based on the status of the MDL proceeding. [*See* Record No. 27, pp. 9-11]

of success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).   None of these are prerequisites that must be met.   Instead, they are interconnected factors that the Court must balance to determine if a preliminary injunction should be granted. *See Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).   Additionally, there is no rigid formality required in applying these factors, and they need not be given equal weight.   They are simply meant to guide the Court in exercising its discretion. *See Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998).

With these general rules in mind, the Court also notes that the plaintiff bears the burden of proving that a preliminary injunction is proper. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).   "A preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration*, 511 F.3d at 542 (internal quotation marks omitted).   While a party is not required to prove its case in full to obtain injunctive relief, the proof needed "is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729,  739 (6th Cir. 2000).

### III.   Analysis

Merck seeks an order enjoining the AG from "pursuing his lawsuit against Merck with contingency-fee counsel."   [Record No. 2-1, p. 25]   It asserts that the method of compensating outside counsel "gives them a significant stake in the outcome."   [*Id.*, p. 6]   As a result, Merck

argues that "the prosecutorial decisionmaking about this case is likely being guided by the profit motivations of contingency-fee counsel," in violation of Merck's due process rights. [*Id.*] It therefore seeks a preliminary injunction to protect it from being "forced . . . to defend itself in an enforcement proceeding that is both unfair and subject to abuse." [*Id.*, pp. 6-7] The AG counters this argument by asserting that the contingency fee arrangement is neither illegal nor violative of Merck's due process rights. Thus, it contends that a preliminary injunction would be unnecessary, improper, and harmful to the public interest.

### A.    Jurisdictional Issues

The AG argues that the claim is not ripe for review because "any final legal outcome is too remote to serve as the basis for a judicial review." [Record No. 15, p. 27] Additionally, he asserts that Merck lacks standing to bring this action because "it has not pleaded and cannot establish an injury in fact that is more than just conjecture, that such injury is causally traceable to the Attorney General, or that this Court can redress Merck's alleged injury." [*Id.*, p. 20] Finally, the AG contends that the Court should abstain from hearing the case on the basis of the doctrines set forth in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). [*Id.*, p. 27] These arguments lack merit.

### 1.    Justiciability

The AG asserts that Merck's claims are not ripe for judicial review because the "harm pleaded by Merck in its complaint is theoretical and too attenuated to serve as the basis of a justiciable claim."[2] [Record No. 15, p. 27] He bases this argument on a misunderstanding of

---

2       The AG cites *State v. Lead Industries Ass'n* (*Lead Industries I*) — in which the Rhode Island Supreme Court decided to postpone its review of a similar contingency fee arrangement — to support his

Merck's claim, however. The AG mistakenly assumes that Merck objects to the possibility that there will be a judgment against it. [*Id.*, p. 26 ("Merck's Complaint cannot show that . . . the mere specter of a monetary settlement or jury trial award won collaboratively by the Office of the Attorney General and outside counsel would be the result of a due process violation.")] However, that is not the issue presented. Merck asserts claims for "constitutional rights [that] are being violated now," not at some point in the future. [Record No. 20, p. 7] The harm it seeks to address is the constitutional violation inherent in being required to defend itself in a biased proceeding. *See Esso Standard Oil Co. v. Mujica Cotto*, 389 F.3d 212, 221 n.10 (1st Cir. 2004) (noting that a biased proceeding "may inflict a constitutional injury independent of [its] outcome"). If the contingency fee arrangement between the AG and outside counsel violates Merck's due process rights, it does so regardless of the ultimate outcome of the litigation. Therefore, the AG's argument concerning ripeness is unpersuasive.

Merck also has standing to bring this action. The requirements for standing are: (1) the plaintiff must have suffered an "injury in fact," (2) there must be a "causal connection between the injury and the conduct complained of," and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

---

claim that Merck "has put the 'cart before the horse.'" [Record No. 15, p. 26 (citing 898 A.2d 1234 (R.I. 2006))] However, aside from the fact that this Court is not bound by the decision in *Lead Industries I*, that case had a significantly different procedural posture. In *Lead Industries I*, after an adverse verdict at the trial, the defendants appealed the denial of their motion to have the contingency fee agreement declared unenforceable and void. 898 A.2d at 1237. The Rhode Island Supreme Court determined that "immediate review [was] not unavoidable" at that stage of the litigation because "several posttrial motions [were] still pending below." *Id.* at 1239. As a result, the court decided that its review could wait until the matter was fully resolved and appealed as a whole. *Id.* However, this Court is not an appellate court. Thus, the result in *Lead Industries I* is not applicable because here, an "aggrieved party" in the underlying action will *not* be "entitled to an appeal to this court." *Id.* at 1240.

To find an "injury in fact," there must be "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal citations and quotation marks omitted).

The AG argues that "the constitutional harm that Merck seeks to avoid in this lawsuit is, as best as the Office of the Attorney General can glean, an increased risk of an overzealous litigation opponent in *Merck I*," and that this increased risk "does not rise to an actual or imminent injury-in-fact." [Record No. 15, p. 21] Again, however, the AG's argument is based on a mischaracterization of Merck's claims. Merck has alleged a violation of its due process rights stemming from the use of contingency fee attorneys in the lawsuit against it. Accepting the allegations in the Complaint as true, Merck has suffered an injury in fact; namely, that it is being forced to "defend itself in an inherently biased quasi-criminal enforcement proceeding." [Record No. 20, p. 9] This is sufficient to constitute a concrete and ongoing injury in fact. *Cf. Esso Standard Oil*, 389 F.3d at 221 (finding an ongoing injury where plaintiff was engaged in administrative proceedings before a biased adjudicator). Moreover, there is a causal connection between the injury and the conduct complained of, because the alleged bias flows from the use of contingency fees to compensate the attorneys prosecuting the action. Finally, a favorable decision would result in the AG being enjoined from using contingency fee attorneys in prosecuting the case against Merck and, therefore, the injury would be redressed. Merck clearly has standing.

-8-

### 2.       Abstention

The AG also avers that the Court should abstain from exercising jurisdiction in this case pursuant to the *Pullman* and *Burford* abstention doctrines.  Under *Pullman*, a federal court must abstain from hearing "cases in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996) (citing *Pullman*, 312 U.S. 496). The AG seems to argue that the Court should abstain in this case because it requires interpretation of the Kentucky statute governing the AG's powers of appointment, KRS § 15.100(3).[3]  He admits, however, that this statute "by its plain terms expressly vests the Attorney General with the statutory authority to enter into contracts for legal services."  [Record No. 15, p. 28]  In other words, the statute is not ambiguous.  Because it does not appear that Kentucky courts could interpret the statute in a way that would obviate the need to consider the constitutional question in this case, *Pullman* abstention is not required.

The *Burford* abstention doctrine counsels federal courts to refrain from hearing "cases raising issues 'intimately involved with [the States'] sovereign prerogative,' the proper adjudication of which might be impaired by unsettled questions of state law." *Quackenbush*, 517 U.S. at 717 (quoting *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28 (1959)).  In *Burford*, the Supreme Court upheld the district court's decision to refrain from considering the reasonableness of the Texas Railroad Commission's grant of a permit to drill oil wells.  *See* 319

---

3       The Court is not convinced that KRS § 15.100(3) is of central importance in this action.  The fact that the AG is empowered to hire outside counsel does not necessitate a finding that the use of that power in this case was constitutional.

U.S. at 317. The Court concluded that abstention was necessary because the availability of a federal forum "threatened to frustrate the purpose of the complex administrative system that Texas had established." *Quackenbush*, 517 U.S. at 725; *see Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959) (describing *Burford* abstention as resting "on grounds of comity with the States when the exercise of jurisdiction by the federal court would disrupt a state administrative process"). The line of cases interpreting *Burford* have clarified that this abstention doctrine should apply where the exercise of federal jurisdiction would disrupt a state's "efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976).

The AG asserts that this Court should abstain under *Burford* because "there exists a formal structure and policy within the state governing the bidding process," which was used for the retention of outside counsel in this case. [*See* Record No. 15, p. 29 (citing KRS § 45A.695).] However, the policy to which the AG refers is not the kind of "plan of regulation" contemplated by the Supreme Court in *Burford*. 319 U.S. at 324. The procedures by which the state solicits bids for outside counsel are far from being "of vital interest to the general public." *Id.* Moreover, even if the bidding process were so important as to implicate "the whole economy of the state," the formal structure of the bidding process would not be upset in any way by a decision that is unfavorable to the AG. *Id.* at 325. There is no reason that finding the contingency fee arrangement to be unconstitutional would prevent the AG from engaging in personal service contracts through a request for proposals, let alone prevent other state

governmental agencies from doing so.  *Burford* and its progeny are simply inapplicable here and abstention is inappropriate.

### B.      The Likelihood of Success on the Merits[4]

A plaintiff "is not required to prove his case in full" when seeking a preliminary injunction.  *Certified Restoration*, 511 F.3d at 542.  However, a plaintiff must show more than a mere possibility of success on the merits.  *Id.* at 543 (internal quotations and citations omitted). "'[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as make them fair ground for litigation and thus for more deliberative investigation.'"  *Id.* (quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

To establish a likelihood of success on the merits of its claim, Merck must "show the likely existence of a constitutional violation c[aus]ally related to the result sought to be enjoined."  *L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 205 (6th Cir. 1985) (citation omitted). Thus, the Court must consider whether the contingency fee arrangement between the Kentucky AG and Garmer & Prather constitutes a "likely" violation of Merck's due process rights.  *Id.*  To do this, the Court must "first examine the requirement of neutrality imposed on government attorneys in certain cases, and then determine whether this requirement applies to attorneys prosecuting" this action under the KCPA.  *People ex rel. Clancy v. Superior Court of Riverside Cnty.*, 705 P.2d 347, 350 (Cal. 1985).  Next, the Court will consider whether the contingency fee arrangement has violated that requirement.

---

4      Although the Court must consider whether there is a strong likelihood of success on the merits, the discussion that follows is not intended to be a final decision on the merits of the case.

## 1.      The Right to an Impartial Tribunal

The right to due process encompasses the right to an impartial tribunal.  This right is clearly violated in a situation where a trial judge has a "direct, personal, substantial pecuniary interest" in a matter before him.  *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).  It is a basic tenet of constitutional law that "due process requires a 'neutral and detached judge in the first instance.'"  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., Inc.*, 508 U.S. 602, 617 (1993) (quoting *Ward v. Monroeville*, 409 U.S. 57, 61-62 (1972)).

The requirement of neutrality is much narrower in the case of prosecuting attorneys.[5] "The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248-49 (1980).  In other words, "[p]rosecutors need not be entirely neutral and detached."  *Id.* at 248 (internal quotation marks omitted).  As a result, a "financial interest that would disqualify a judge . . . may be 'too remote and insubstantial to violate the constitutional constraints applicable to the decisions of [one] performing prosecutorial functions.'"  *Dick v. Scroggy*, 882 F.2d 192, 197 (6th Cir. 1989) (quoting *Marshall*, 446 U.S. at 243-44).

---

5       The Kentucky AG is "the chief law officer of the Commonwealth," KRS § 15.020, and the "General Assembly has enacted a number of statutory provisions that authorize the Attorney General to prosecute criminal actions under certain circumstances." *St. Clair v. Commonwealth*, 140 S.W.3d 510, 531 (Ky. 2004). Additionally, it is the AG's "responsibility to file suit to vindicate public rights, as attorney for the people of the State of Kentucky." *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 173 (Ky. 2009) (quoting *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 618 (Ky. 1992) (Leibson, J., dissenting)).

-12-

However, "traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law." *Marshall*, 446 U.S. at 249.  The duty of a prosecutor is to seek justice.  And a "scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring . . . impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Id.* at 249-50.  Consequently, there are certain circumstances under which a prosecutor's financial interest in the outcome of a case will violate the defendant's right to due process.

For example, the right to an impartial tribunal precludes the use of contingency fee contracts in criminal prosecutions.  Because the prosecutor's duty to serve the public interest can be distorted by a system of remuneration that compensates him based on the outcome of cases, contingency fee "contracts for criminal prosecutors have been recognized to be unethical and potentially unconstitutional." *Clancy*, 705 P.2d at 351 (noting, however, that "there is virtually no law on the subject"); *see State v. Lead Indus. Ass'n* (*Lead Industries II*), 951 A.2d 428, 476 n.48 (R.I. 2008) ("Indeed, we are unable to envision a criminal case where contingent fees would ever be appropriate."); *see also Baca v. Padilla*, 190 P. 730, 732 (N.M. 1920) ("To permit and sanction the appearance on behalf of the state of a private prosecutor, vitally interested personally in securing the conviction of the accused, not for the purpose of upholding the laws of the state, but in order that the private purse of the prosecutor may be fattened, is abhorrent to the sense of justice and would not, we believe, be tolerated by any court.").

-13-

The standard of neutrality required of state-employed prosecutors also extends to private counsel that perform a prosecutorial function. *See Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 757 (explaining that a "private attorney appointed to prosecute a criminal contempt [action] . . . certainly should be as disinterested as a public prosecutor who undertakes such a prosecution"). "The responsibility follows the job." *Clancy*, 705 P.2d at 351. In other words, "behavior deemed unacceptable for government attorneys must also be deemed unacceptable for private actors performing the identical functions." Martin H. Redish, *Private Contingent Fee Lawyers and Public Power: Constitutional and Political Implications*, 18 S. Ct. Econ. Rev. 77, 96 (2010). Thus, a private attorney performing a prosecutorial function is subject to the same ethical and constitutional requirements that govern a state-employed prosecutor. *See id.* at 95 ("Any other conclusion would allow government to circumvent the political and constitutional limits on its authority simply by authorizing previously private actors to exercise public power."). Accordingly, it is improper for a private attorney prosecuting a criminal action to enter into a contingency fee agreement.

### 2.    The Requirement of Neutrality in Certain Civil Actions

The rule against the use of contingency fees in criminal actions has been extended to certain civil actions that resemble criminal prosecutions. Some civil cases may "demand[] the representative of the government to be absolutely neutral." *Clancy*, 705 P.2d at 352. This principle of neutrality has been applied to eminent domain actions and actions to abate a public nuisance. *See id.* at 353. For instance, in *Clancy*, the California Supreme Court concluded that the contingency fee arrangement between the City of Corona and a private attorney was

-14-

"antithetical to the standard of neutrality that an attorney representing the government must meet when prosecuting a public nuisance abatement action." *Id.*  The court in *Clancy* based its analysis on the similarity of public nuisance abatement actions to criminal prosecutions, noting that they "share the public interest aspect of eminent domain and criminal cases, and often coincide with criminal prosecutions." *Id.* at 352.  In such a case, the court reasoned, a "financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated." *Id.*  Thus, quasi-criminal civil cases may implicate the AG's requirement of neutrality.

However, this class of civil actions is small.  Abatement of public nuisance and eminent domain cases involve a "delicate weighing of values." *Id.* at 353.  In *City & County of San Francisco v. Philip Morris*, the United States District Court for the Northern District of California found that a lawsuit against cigarette manufacturers, alleging "conspiracy to mislead plaintiffs and their residents regarding the dangers associated with smoking," did not require such a weighing of values.  957 F. Supp. 1130, 1134-35 (N.D. Cal. 1997).  Instead, it concluded that the "lawsuit, which [was] basically a fraud action, d[id] not raise concerns analagous to those in the public nuisance or eminent domain contexts." *Id.*  Similarly, in *Philip Morris Inc. v. Glendening*, the Court of Appeals of Maryland upheld the Maryland Attorney General's retention of contingency-fee counsel to assist with tort litigation against tobacco companies.  709 A.2d 1230, 1242-44 (Md. Ct. App. 1998) (noting that "there are no constitutional or criminal violations directly implicated here").[6]

---

6       Some courts have drawn a bright line between criminal and civil cases.  *See Lead Industries II*, 951 A.2d at 475 (concluding that "there is nothing unconstitutional or illegal or inappropriate in a contractual relationship whereby the Attorney General hires outside attorneys on a contingency fee basis to assist in the litigation of certain *non-criminal* matters" (emphasis in original)).

The underlying action in this case does not fit easily into the framework established by these cases. The lawsuit against Merck is a consumer protection action alleging "unfair, false, misleading and deceptive acts and practices in trade or commerce in Kentucky." [Record No. 15, p. 6] Neither the AG nor Merck has identified any case in which a court determined the proper standard of neutrality in a consumer protection action. Merck asserts that the Vioxx litigation "resembles a criminal prosecution" because it "seeks penalties — not compensation." [Record No. 2-1, p. 15] It maintains that because a claim for penalties under the KCPA "does not require proof of actual damages," the statute is penal in nature, and therefore, the requirement of neutrality should apply. [*Id.*, p. 16 (citing *US Fax Law Ctr., Inc. v. iHire, Inc.*, 374 F. Supp. 2d 924, 928-29 (D. Colo. 2005) (finding that the Colorado Consumer Protection Act is penal in nature))] Conversely, the AG asserts that "Merck's repeated suggestion that the 'coercive' nature of the claims . . . somehow transmute that civil litigation into criminal litigation is patently false and legally unsupportable." [Record No. 15, p. 12]

It would certainly appear that the KCPA serves certain purposes that are not strictly remedial, although no Kentucky court has described the KCPA, as a whole, to be either penal or remedial in nature. There are remedial provisions within the KCPA, but those provisions are not implicated in this case. *See Brewer v. Portfolio Recovery Assocs.*, No. 1:07CV-113-M, 2007 WL 3025077, at *3 (W.D. Ky. Oct. 15, 2007) ("The remedial provisions of the KCPA require[] that privity of contract exist between the parties." (internal quotation marks omitted)). The AG seeks statutory penalties in the underlying action against Merck. The amount of those penalties is not based on the loss suffered; rather, the penalties are awarded "if the court finds that a person

-16-

is willfully using or has willfully used a method, act, or practice declared unlawful by KRS 367.170." KRS § 367.990(2).  The civil penalties sought by the AG are intended to punish and deter.  *See Commonwealth ex rel. Chandler v. Anthem Ins. Co.*, 8 S.W.3d 48, 54 (Ky. Ct. App. 1999) (construing the KCPA "broadly to effectuate its purpose of curtail[ing] unfair, false, misleading or deceptive practices in the conduct of commerce." (internal quotation marks omitted)).  Therefore, the Court finds that the KCPA action against Merck is penal in nature and thus implicates the requirement of neutrality.

### 3.       Limitations on the Contingency Fee Arrangement

Even in civil cases that implicate the prosecutor's requirement of neutrality, the existence of a contingency fee arrangement with outside counsel does not necessarily violate the defendant's due process rights.   *Cnty. of Santa Clara v. Superior Court*, 74 Cal. Rptr. 3d 842, 853 (Cal. Ct. App. 2008) ("*Clancy* itself does not bar . . . public entities from engaging private counsel under a contingent fee arrangement."); *see Clancy*, 705 P.2d at 352 ("Nothing we say herein should be construed as preventing the government, under appropriate circumstances, from engaging private counsel.").  Most courts that have considered the issue have determined that "contingency fee arrangements between state attorneys general and outside counsel are permissible if certain criteria are met."  Leah Godesky, Note, *State Attorneys General and Contingency Fee Arrangements: An Affront to the Neutrality Doctrine?*, 42 Colum. J.L. & Soc. Probs. 587, 590 (2009).  As long as safeguards are in place, a government agency's contingency fee contract with outside counsel does not infringe on a defendant's due process rights.

-17-

There is a "critical distinction between a private attorney who *supplants* the public entity's 'duly authorized counsel' and a private attorney who serves only in a *subordinate* role as 'co-counsel' to the public entity." *Santa Clara*, 74 Cal. Rptr. 3d at 852. Thus, a significant factor to consider when evaluating a contingency fee arrangement such as the one here is the extent to which the attorney general exercises control over the litigation. In *Clancy*, the court found that the contingency fee arrangement violated the defendants' due process rights because the private counsel "was serving as Corona's *sole* representative in its public nuisance abatement action and had *complete control* over the litigation." *Id.* at 853. However, in situations where the government retained control over the litigation, courts have tended to uphold such arrangements. For instance, the court in *Glendening* upheld the contract because the private attorneys were "subject to the oversight of the Attorney General." 709 A.2d at 1244 (finding that *Clancy*'s lack of the "oversight of an elected State official" was a "significant material distinction[] which permit a finding that the instant contingency fee contract is not violative of due process or public policy"). Thus, if the government attorney or prosecutor retains "full control over the course of the litigation," then the right to an impartial tribunal is not infringed by the use of a contingency fee arrangement. *Philip Morris*, 957 F. Supp. at 1135; *see Lead Industries II*, 951 A.2d at 475 (explaining that contingency fee agreements can be constitutional "so long as the Office of Attorney General retains absolute and total control over all critical decision-making" (emphasis omitted)).

Thus, the fundamental inquiry in this case concerns the issue of control over the litigation. Consequently, the Court must look to the private counsel's level of "decision-making

authority" and "power to control the litigation." *Santa Clara*, 74 Cal. Rptr. 3d at 848; *see Glendening*, 709 A.2d at 1243. If those powers are explicitly retained by the AG, then the principle of neutrality need not apply to the private counsel, because they are "not in a position where their interest in maximizing their contingent fee can influence the balancing of interests or any of the other decisions that are made exclusively by" the AG. *Santa Clara*, 74 Cal. Rptr. 3d at 850. Here, the terms of the contract expressly reserve the AG's authority to "direct the litigation in all respects." [Record No. 2-3, p. 5]

Even though there is an explicit clause reserving the AG's authority over the Vioxx litigation, the Court may ask whether the private counsel "have ever engaged in any conduct that invaded the sphere of control" reserved to the AG's office. *Santa Clara*, 74 Cal. Rptr. 3d at 853. The requirement of neutrality would still apply if outside counsel could be shown to have acted in a way that indicates a lack of control on the part of the AG. *See id.* Here, however, Merck has failed to establish a likelihood that the contingency fee counsel have actually assumed control over the Vioxx litigation. [Record No. 2-1, p. 20] It contends that "there is a substantial risk that [contingency-fee counsel] will prosecute the action in an overzealous manner, seeking the maximum amount of civil penalties." [*Id.*, p. 20] This is because, according to Merck, "the more penalties they pursue, the bigger their potential take." [*Id.*, p. 6] However, the AG sought the maximum penalties from the initiation of the action, before the involvement of the contingency-fee counsel. [*See* Record No. 2-2, p. 8] Therefore, the amount of the penalties does not support a finding that outside counsel have usurped the AG's authority. Merck also argues that the AG has ceded control over the action because "outside counsel have handled all

-19-

appearances . . . in the MDL proceeding."  [*Id.*] But physical presence is not the only indicator of oversight or control.  The argument that the AG delegated his decision-making authority simply because he did not attend hearings is simply insufficient.

In summary, although this is a civil case that would require the AG's neutrality due to its penal nature, the facts in the record do not indicate a lack of control over the litigation on the part of the AG.[7]  Because the AG has retained the authority to direct the course of the action, the contingency fee counsel are not subject to the requirement of neutrality.  *See Santa Clara*, 74 Cal. Rptr. 3d at 850.  Therefore, Merck has not established a substantial likelihood that it will prevail on the merits of its constitutional claim.[8]

## C.    Irreparable Harm

To succeed on a motion for a preliminary injunction, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 8 (2008) (rejecting a standard based on the "possibility" of irreparable harm as "too lenient").  Generally, a "plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."  *Overstreet*, 305 F.3d at 578 (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).  However, if the Court determines that the plaintiff has failed to show a likelihood of success on the merits, irreparable injury will be more difficult to establish.  *Cf. Nightclubs, Inc.*

---

7    Merck did not request discovery on this motion.  [Record No. 27, p. 4 ("We think that the record will be laid out sufficiently in the papers . . . .")]

8    Again, the "findings of fact and conclusions of law made by a district court in granting [or denying] a preliminary injunction are not binding at a trial on the merits."  *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).  Certain questions may still exist as to whether the AG maintained or exerted *actual* control over the litigation.

*v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000) (explaining that, in the context of a First Amendment claim, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits" because the "harm to the respective parties largely depend[s] on the constitutionality of the [state action]").

Merck's primary argument in favor of a finding of irreparable injury is based on the alleged violation of its due process rights. [Record No. 2-1, p. 19 ("A finding of irreparable injury is . . . mandated in this case because the Kentucky AG has violated Merck's fundamental right to due process under the Fourteenth Amendment.")]   However, because it has failed to establish a likelihood of success on the merits of its due process claim, this argument is foreclosed.  Merck also argues that there is a "substantial risk that the Company will suffer irreparable financial and reputational harm because it must defend against a lawsuit being prosecuted under an unconstitutional contingency-fee agreement." [*Id.*, p. 20]  It asserts that it has "incurred substantial legal fees and runs the risk of suffering reputation harm and loss of customer goodwill." [*Id.*, p. 21]  The Court fails to see how these harms would be alleviated by the requested injunction.  Merck is not "asking the Court to enjoin the AG from suing it." [Record No. 20, p. 14]  Therefore, the harms alleged by Merck, including legal fees and reputational damage, would not be relieved by the issuance of an injunction.  *See Certified Restoration*, 511 F.3d at 542.

Moreover, Merck's delay in bringing this lawsuit belies its claim of irreparable harm. *See McDonald's Corp. v. Burger King Corp.*, 87 F. Supp. 2d 722, 725 (E.D. Mich. 1999) (finding that one-year delay in "asserting its alleged rights belies a claim of irreparable harm").

-21-

Merck filed suit against the AG almost one year after he retained outside counsel through a contingency fee contract. [*See* Record Nos. 1, 2-3]  In fact, as the AG points out, "Merck did not file its section 1983 claim and Motion until *after* the Attorney General filed its Motion to Remand in the MDL." [Record No. 15, p. 34]  Merck counters that "the KCPA action was stayed," and so "[i]t made little sense for Merck to commence a federal lawsuit challenging the retention of contingency-fee counsel while the litigation was dormant." [Record No. 20, pp. 12-13]  Merck concedes, however, that discovery was stayed "because of the parties' settlement discussions." [Record No. 2-1, p. 8; *see* Record No. 20-4]  The Court fails to see why Merck would face irreparable harm from active litigation against contingency fee counsel, but not from engaging in settlement negotiations with those same attorneys.  In short, Merck has failed to sufficiently explain its delay in seeking a preliminary injunction.

### D.    Balance of Hardships

The third factor in the Court's analysis — whether the injunction would cause substantial harm to others — is a question of balancing competing harms.  The Court must "(1) balance the harm Plaintiff would suffer if its request for a preliminary injunction were denied against the harm Defendants would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties."  *Rest. Adver. Grp., Inc. v. J.P. Morgan Chase & Co.*, No. 2:04-cv-1020, 2005 WL 6736847, at *11 (S.D. Ohio Feb. 11, 2005).  As discussed above, Merck claims that it will suffer "a violation of the rights guaranteed to it under the Constitution." [Record No. 20, p. 14]

The AG asserts that "the harm to . . . this office would be significant if it were to be precluded from choosing its own outside counsel with resource capabilities and experience matching those of Merck's lawyers, or if it could no longer be represented in this action by the lawyers that have represented its interests for over a year." [Record No. 15, p. 37]  Merck contends that "[i]f an injunction issues, the AG can amend the fee agreement and continue with his current counsel." [Record No. 20, p. 14]  Merck's argument, however, assumes that the AG's office could afford to do so.  The AG has submitted an affidavit from Larry Clarke, Director of Administrative Services of the Office of the Attorney General, that "the budget of the Office of the Attorney General has been reduced approximately 25% since Attorney General Conway took office in January 2008." [Record No. 15-7 ¶ 8]  As a result, the "office does not currently have sufficient unallocated funds to retain and hire outside counsel to undertake the Vioxx case if it were required to pay an hourly rate at prevailing market rates." [*Id.* ¶ 10]  Nor, according to Clarke, could the AG hire additional government attorneys to prosecute the case. [*Id.* ¶ 11]  As a result, Merck's contention that the Commonwealth would suffer "little prejudice" if the Court were to grant the preliminary injunction is unpersuasive. [Record No. 2-1, p. 21]

The potential for a constitutional violation would outweigh such a setback, if that harm were *likely* to occur.  However, in light of the Court's conclusion that Merck has not established a substantial likelihood that it will prevail on the merits of its constitutional claim, the AG's use of contingency fee counsel does not pose an imminent or ongoing threat of constitutional injury to Merck.  Thus, this factor weighs in favor of denying the preliminary injunction.

-23-

### E.     The Public Interest

Finally, the Court must weigh whether the public interest would be served by granting a preliminary injunction.  There is, of course, a strong public interest in the protection of due process rights.  *See G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").  On the other hand, as the AG points out, "the mere fact that Merck *asserts* a constitutional injury does not eliminate . . . the requirement that it *prove* its entitlement to a preliminary injunction."  [Record No. 15, p. 41]  The AG posits that the "true public interest" at issue here is the "ability of the state to efficiently and effectively bring a civil action to enforce its laws so as to protect the state and its citizens."  [*Id.*]  Indeed, "the ability of Attorneys General to enter into [contingency fee contracts] may well, in some circumstances, lead to results that will be beneficial to society — results which otherwise might not have been attainable."  *Lead Industries II*, 951 A.2d at 475.  The Court finds that this factor cuts both ways.  Thus, the public interest does not weigh either for or against the issuance of a preliminary injunction in this case.

### IV.    Conclusion

A "preliminary injunction is reserved for only the most egregious case, and should not be extended to cases which are doubtful or do not come within well-established principles of law."  *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001) (citing *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972)).  The law concerning the constitutionality of contingency fee arrangements in quasi-criminal civil cases

is far from settled, and Merck has failed to carry its burden of proving that a preliminary injunction would be appropriate in this case. Accordingly, it is hereby

**ORDERED** that Plaintiff Merck Sharp & Dohme Corporation's Motion for Preliminary Injunction [Record No. 2] is **DENIED**.

This 21st day of March, 2012.

Signed By:

*Danny C. Reeves*  DCR

United States District Judge