### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION AT FRANKFORT

**FILED ELECTRONICALLY**

| | | |
|---|---|---|
| Merck Sharp & Dohme Corp., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:11-cv-00051-DCR |
| Jack Conway, in his official capacity as | ) | |
| Attorney General of the Commonwealth of | ) | |
| Kentucky, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

The Kentucky Attorney General ("AG") has sued Merck Sharp & Dohme Corp.

("Merck") in state court for alleged violations of the Kentucky Consumer Protection Act

("KCPA"). Rather than prosecute this suit itself, the AG's office has enlisted outside counsel on

a contingent-fee basis to take the "lead role" in the litigation as to "all phases."

As the Court recognized in denying the AG's first motion to dismiss, retention of outside

counsel on a contingent-fee basis in a case such as this one is only permissible where the AG

retains complete control over the action. Discovery has now confirmed that the Kentucky AG is

***not*** in control of the state-court litigation. At a recent deposition, the AG's "most

knowledgeable" attorney could not answer basic questions about core facts alleged in the

complaint; had not reviewed the factual basis for any of the 45 alleged KCPA violations

compiled by outside counsel; was unfamiliar with the vast majority of witnesses on the

Commonwealth's good-faith trial witness list; and was not aware whether experts have been

formally retained for the KCPA action. Without such knowledge, the AG cannot meaningfully

supervise, let alone control, outside counsel. Simply put: the AG cannot be making decisions about the course of the lawsuit and what penalties to pursue when its most "knowledgeable" attorney knows next to nothing about the substance of its claims against Merck or how its counsel plan to prosecute those claims at trial.

Not only has the AG violated Merck's due process rights, but the injury to Merck constitutes irreparable injury per se, irremediable by any remedy at law. Accordingly, the Court should grant summary judgment to Merck and permanently enjoin the AG from the use of outside counsel on a contingent-fee basis in its state-court action against Merck.

## STATEMENT OF FACTS

### A.   Vioxx

Vioxx is an anti-inflammatory pain reliever – developed, manufactured and marketed by Merck – that was available by prescription from May 1999 through September 2004. Vioxx belongs to the class of non-steroidal anti-inflammatory drugs ("NSAIDs"). Traditional NSAIDs, such as ibuprofen, suppress two forms of an enzyme called "cyclooxygenase" that are known as "COX-1" and "COX-2." Because the COX-1 enzyme protects the lining of the stomach, traditional NSAIDs are believed to cause gastrointestinal problems, largely from inhibition of COX-1 activity. By contrast, Vioxx is a selective COX-2 inhibitor, a type of NSAID that selectively blocks only the COX-2 enzyme and is therefore less likely to cause the gastrointestinal issues associated with traditional NSAIDs.

Vioxx was withdrawn from the market on September 30, 2004, after an external safety board monitoring the results of a long-term study – the APPROVe study – informed Merck that interim data from the study showed an increased rate of cardiovascular events in the group taking Vioxx after 18 months of continuous use, compared to the group taking a placebo. After Merck voluntarily withdrew Vioxx from the market in 2004, plaintiffs began filing lawsuits in courts

around the country alleging that they had sustained heart attacks, strokes and other physical injuries as a result of their ingestion of Vioxx.  *See, e.g.*, *Plunkett v. Merck & Co.*, 401 F. Supp. 2d 565, 571 (E.D. La. 2005).  In February 2005, the Judicial Panel on Multidistrict Litigation created a multidistrict litigation ("MDL") proceeding before the Honorable Eldon E. Fallon of the United States District Court for the Eastern District of Louisiana to coordinate pretrial discovery in the Vioxx cases pending in federal courts around the country.  *Id.*; *see also In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).

The litigation swelled, ultimately embracing tens of thousands of cases in several jurisdictions.  Among these cases were several consumer-protection actions commenced by state attorneys general from around the country.  In mid-2008, Merck settled consumer-protection claims with the attorneys general of 29 states and the District of Columbia.  *See, e.g.*, Stipulated J. As To The Def., *State of Conn. v. Merck & Co.* (Super. Ct. Jud. Dist. Of Hartford, May 20, 2008) (attached as Ex. 1).  As part of this resolution agreement, Merck paid $58,000,000 to the participating states.  *See, e.g.*, *id.* ¶ 25.

### B. The AG's Pre-Suit "Investigation"

Although the Commonwealth reportedly first learned of Merck's allegedly deceptive promotional activities in November 2004, the Kentucky AG did not conduct any independent investigations in connection with these claimed violations until 2009.  (Dep. of Elizabeth Natter ("Natter Dep.") 88:14-89:7, 107:17-20, 110:5-12, 111:13-22, 112:22-113:19, Nov. 27, 2012 (attached as Ex. 2).)  Nor did it monitor the ongoing Vioxx litigation against Merck, or review any of the discovery collected in the MDL proceeding.  (*Id.* 110:14-111:5, 146:4-7.)  Indeed, the AG's 30(b)(6) deponent, Elizabeth Natter, was not even aware of any Vioxx litigation until sometime in 2009.  (*Id.* 137:22-138:11.)  As she put it, she did not "think it was a priority for the office" through 2008.  (*Id.* 124:17-18.)

3

Some time in 2009, the office developed an interest in Vioxx after learning that other states had participated in a settlement of consumer-protection claims. (*See id.* 75:15-76:10, 112:20-114:7.) By August 2009, believing that they were operating under a five-year statute-of-limitations period, unnamed supervisors urged Ms. Natter to seek a tolling agreement with Merck "for the purpose of investigating and determining if we should file suit." (*Id.* 76:1-5, 127:10-19, 130:21-131:4, 137:6-16.)[1] She did, and Merck declined. (*See id.* 76:1-7.) Absent tolling, the Office's near five-year delay in initiating its investigation meant that a complaint "would need to be filed in fairly short order." (*Id.* 127:17-18.) Thus, "at that point," Ms. Natter began "drafting a complaint." (*Id.* 76:5-7.)

With no serious investigation having been done by her own office, Ms. Natter based her complaint "largely on information that we got in reliance on other assistant attorneys general . . . who had investigated allegations against Merck." (*Id.* 141:8-12; *see also id.* 140:19-24 (admitting that her office had not done "the kind of thorough, you know, months-long investigation that we might do in some cases"); *id.* 163:23-164:6 (agreeing that the "entire time period" of the pre-suit investigation was approximately two months).) In fact, she had "other complaints . . . filed by other attorneys general" in front of her while she drafted. (*Id.* 142:11-143:19 (Ms. Natter testifying that she "looked at Florida" and Oregon complaints but refusing to provide any detail on the extent of her reliance on these complaints on the ground that it is work product); *see also id.* 76:7-10 (explaining that the KCPA complaint was based on "publicly available information" and "the investigation that had been done by other states' assistant attorneys general with whom I was in contact").) The substantive allegations of the final complaint filed in the KCPA action track those in Florida's Vioxx consumer complaint almost

---

[1]      Merck does not accept the AG's positions regarding the statute of limitations in the underlying case, but the
*(cont'd)*

word for word.  (*Compare generally* KCPA Compl. (attached as Ex. 3) *with* Florida Compl. (attached as Ex. 4); *see also* Redline Comparison of KCPA Complaint with Florida Compl. (attached as Ex. 5).)

Not surprisingly, Ms. Natter has no understanding to this day of the core allegations of her Complaint.  Although Ms. Natter testified that she personally signed the Complaint and was its "primary drafter" (Natter Dep. 139:14-22), she was unable to answer straightforward questions at her deposition pertaining to some of the core allegations in the Commonwealth's Complaint.  For example, although Study 090 is discussed repeatedly in the Complaint (*see* KCPA Compl. ¶¶ 9, 15, 20), Ms. Natter could not recall anything about the study – its purpose, the comparator drug used, or the indication studied (*see* Natter Dep. 146:16-19 (**Q:**  "What is Study 090?"  **A:**  "Sitting here at this moment . . . I can't tell you what Study 090 was by that name."); *see also id.* 146:20-147:18).  She further admitted that she did not know the basis for the Commonwealth's allegations pertaining to Study 090.  (*Id.* 147:23-148:18.)  Likewise, the ADVANTAGE Trial is also discussed at length in the Complaint (*see* KCPA Compl. ¶¶ 11, 23-24), but Ms. Natter again could not recall the purpose of the study beyond what was stated in the Complaint; nor could she name the comparator drug used in the trial (Natter Dep. 154:16-157:12).[2]  In Ms. Natter's words, she is "not aware of every detail that is in this complaint." (Natter Dep. 157:10-12.)

### C.    The AG's Commencement Of Litigation And Retention Of Outside Counsel

On September 28, 2009 – almost five years after Vioxx was withdrawn from the market – the Kentucky AG filed the KCPA complaint.  In the main, the Complaint alleges that Merck

---

*(cont'd from previous page)*
limitations issue is immaterial to Merck's motion here.

[2]     Notably, even in the course of litigating this federal case, Ms. Natter admitted that her office has

*(cont'd)*

violated the KCPA in marketing and distributing the FDA-approved prescription medication Vioxx.  That action, *Commonwealth of Kentucky ex rel. Conway v. Merck & Co.* (the "KCPA action"), which was filed in the Franklin Circuit Court, was subsequently removed to federal court and ultimately transferred to the United States District Court for the Eastern District of Louisiana as part of *In re Vioxx Products Liability Litigation*, MDL No. 1657 (E.D. La.).  Even during this period, no substantive investigation by the AG's office commenced; instead, it focused its efforts solely on "litigating the transfer" to the MDL proceeding.  (Natter Dep. 176:7-11.)

This effort failed, and shortly after the KCPA action arrived in the MDL proceeding, the AG's office sought and retained contingency-fee counsel to prosecute the suit, entering into a contract with the Garmer & Prather firm of Lexington, Kentucky in September 2010.  (*See id.* 176:22-177:3.)  The contractual agreement "retains the right" of the AG's office "at all times to direct the litigation in all respects, including but not limited to, whether and when to initiate litigation, against whom actions will be taken, the claims to be made in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested."  (2010 Contract at 3 (attached as Ex. 6).)  Notwithstanding this general language, however, the contract expressly provides that contingency-fee counsel shall "assum[e] [the] lead role in investigating and . . . preparing litigation against Merck."  (*See id.* at 3.)  This "lead role" extends to a broad range of expressly defined activities, including, but not limited to:

- "investigating and, if warranted, preparing litigation against Merck & Co. Inc. and other potentially responsible entities";

- "conduct[ing] all phases of investigation and litigation including responding to motions, including motions to dismiss";

---

*(cont'd from previous page)*
occasionally had to "request[] some factual background from outside counsel."  (Natter Dep. 13:12-13.)

6

- "drafting and answering discovery propounded to the Commonwealth";

- "coordinat[ing] litigation with other states and the federal government to promote, to the extent beneficial, a unified approach to these cases";

- "taking" and "defending depositions";

- "responding to motions for summary judgment and other pretrial dispositive motions";

- "identif[ying] [and preparing] . . . experts to testify in favor of the Commonwealth";

- "assessing the strength of legal arguments propounded by the litigants"; and

- "represent[ing] the Commonwealth in trial or in any settlement negotiations that may occur."

(*Id.* at 3-4.)

Pursuant to this agreement, Garmer & Prather has agreed to prosecute the KCPA action in exchange for an 18 percent contingency fee of any civil penalties or other amounts recovered from Merck.  (*See* Bates No. 000013 (attached as Ex. 7).)  The firm has also agreed to advance "[a]ll expenses incurred in the investigation, assessment and litigation."  (*Id.*)  These costs are not recoverable if Merck does not pay civil penalties in the KCPA action.  (Natter Dep. 218:5-219:6.)

At the moment outside counsel was retained in the KCPA action, the AG's office disappeared from the MDL proceedings.  Outside counsel submitted all briefs to the MDL court, often without a signature or reference to the AG's office.  (Merck v. AG 000114-000115; Merck v. AG 000116-000126; Merck v. AG 000128-000130; Merck v. AG 000140-000141 (attached collectively as Ex. 8).)  Letters to the MDL court were similarly devoid of any reference to the AG, and were submitted on Garmer & Prather letterhead.  (Merck v. AG 000002-000007; Merck v. AG 000057-000058 (attached collectively as Ex. 9).)  The AG's office also failed to appear at

hearings before the MDL court.[3]  When MDL mediation proceedings were initiated in November 2010, the Commonwealth was represented by outside counsel, and no representative from the AG's office participated either in person or telephonically.  (Natter Dep. 223:6-224:4.)

Outside counsel also assumed the lead role in communicating with Merck during this period.  (*Id.* 225:17-226:1; *see also* Merck v. AG 000059-62 (attached as Ex. 10).)  Indeed, all correspondence relating to the KCPA action while it was pending in the MDL proceeding was exchanged directly between outside counsel and Merck.  (Natter Dep. 225:17-226:1; *see also* Merck v. AG 000059-62.)

Over the course of 2011, Merck engaged in a settlement process with representatives of the National Association of Medicaid Fraud Units ("NAMFCU") to resolve outstanding AG-sponsored litigation involving Vioxx.  The NAMFCU settlement, which focused mostly on Medicaid-related claims, ultimately resulted in a payment by Merck of $915 million to settle Vioxx-related claims with the federal government and 42 states in November 2011.  Kentucky was invited to participate, but outside counsel refused Merck's settlement offer in connection with the NAMFCU settlement process.  (Merck v. AG 000023-000024 (attached as Ex. 11).)  The letter declining the offer was prepared on outside counsel's letterhead and signed by Brian Vines, an attorney for Hare Wynn.  (*Id.*)  The Kentucky AG's office was not mentioned in the letter, and no attorney from the AG's office was listed in the correspondence.  (*Id.*)

In light of outside counsel's lead role in all communications, Merck became increasingly concerned that the Commonwealth was not appropriately engaged in settlement discussions.  As such, Merck hired Terry McBrayer, an attorney in Kentucky, to discuss the terms of the

---

[3]     Ms. Natter appeared telephonically at "some" MDL status conferences, but admits that she never spoke on the record, other than to introduce herself to the court.  (Natter Dep. 221:10-223:5.)  No representative from the AG's office personally appeared at MDL conferences.

settlement directly with the Kentucky AG.  (Dep. of Terry McBrayer ("McBrayer Dep.") 12:5-8, 23:1-11, Nov. 13, 2012 (attached as Ex. 12).)[4]  Prior to the Kentucky AG's discussions with Mr. McBrayer concerning the rejection of the NAMFCU settlement offer, no attorney from the AG's office had even seen the letter declining Merck's settlement offer.  (McBrayer Dep. 47:8-17; *see also* Natter Dep. 294:6-12.)  Although Ms. Natter maintains that the AG's office "authorized [outside counsel] to reject the offer" (Natter Dep. 294:10-12), she admits that no attorney from the AG's office saw the letter before it was sent (*id.*).

In short, the AG's office hired outside counsel, handed over the reins, and checked out of the litigation while it was pending in the MDL proceeding.  Perhaps unsurprisingly, Ms. Natter described her recollection of this period of the litigation as "fuzzy."  (*Id.* 17:16.)

### D.    **Merck's Assertion Of Its Constitutional Right To Due Process**

In light of Mr. McBrayer's meeting with the AG – and particularly the AG's apparent lack of familiarity with the proposed NAMFCU settlement – Merck became concerned that the AG's office had abdicated control of the litigation to its outside counsel.  Thus, in August 2011, while the KCPA action was still pending in the MDL proceeding, Merck commenced suit in this Court against the AG, seeking injunctive relief from the violation of its due process right to a fair proceeding pursuant to 42 U.S.C. § 1983.  The Complaint explains that the Kentucky AG has improperly delegated the coercive powers of the Commonwealth to outside lawyers who have a

---

[4]    The AG's office has suggested in its discovery requests that Merck's counsel acted inappropriately in contacting the office directly through Mr. McBrayer.  (*See, e.g.*, Def.'s Req. For Admission No. 5 (attached as Ex. 13) ("Admit or deny that, in 2011, Terry McBrayer, acting as an agent or representative for Merck, requested a personal meeting with the Attorney General to discuss *Commonwealth of Kentucky, ex rel. Jack Conway, Attorney General v. Merck & Co., Inc.*, and Mr. McBrayer, without outside counsel present, did meet with the Attorney General to discuss potential settlement of the KCPA litigation."); Def.'s First Reqs., Interrog. No. 9 ("[E]xplain in detail why Merck hired Terry McBrayer to meet with the Attorney General to discuss settlement of the Commonwealth's KCPA litigation if the Attorney General did not 'control' the litigation.") (citing Ky. Sup. Ct. R. 3.130(4.2) (relating to communications with other persons represented by counsel)).)  As set forth in further detail in the Argument section below, this accusation is misguided and serves only to highlight the AG's lack of control over the KCPA action.

9

clear, direct and substantial financial stake in the outcome of the underlying KCPA lawsuit.  (*See* Merck Compl. ¶¶ 29-30 (attached as Ex. 14).)  The Complaint further alleges that this delegation of powers has tainted the fairness of the underlying KCPA action, which in turn has deprived Merck of its fundamental right to due process under the Fourteenth Amendment.  (*Id.*)

Merck moved for a preliminary injunction, and the AG moved to dismiss.  The Court denied both motions but made clear that Merck had stated a viable claim that should proceed to discovery.  The Court explained that the "KCPA action against Merck is penal in nature and thus implicates the [due process] requirement of neutrality."  (Order Denying Merck's Motion for a Preliminary Injunction at 17, ECF No. 31.)  It further held that "the existence of a contingency fee arrangement with outside counsel does not ***necessarily*** violate the defendant's due process rights . . . ***if*** the government attorney or prosecutor retains full control over the course of the litigation."  (*Id.* at 17-18 (internal quotation marks and citation omitted, emphases added).)  Thus, it explained, "the fundamental inquiry in this case concerns the issue of control over the litigation."  (*Id.* at 18.)

As the Court recognized in denying the AG's motion to dismiss, Merck's Complaint "alleges numerous facts that support Merck's contention that the AG has allowed contingency-fee counsel to assume the lead role in prosecuting the action."  (Mem. Op. & Order at 6, ECF No. 32 (internal quotation marks and citation omitted).)  In particular, the Court noted, "Merck asserts that all relevant correspondence and other communications have come from contingency-fee counsel."  (*Id.* (internal quotation marks and citation omitted).)  As such, the Court concluded, Merck had "pleaded sufficient facts to proceed to discovery" on the issue of whether "private

counsel have ever engaged in any conduct that invaded the sphere of control reserved to the AG's office." (*Id.* at 8 (internal quotation marks and citation omitted).)[5]

      **E.**      **The Subsequent Proceedings In The KCPA Action**

Since the commencement of the instant suit, the KCPA action has been remanded to state court and is now proceeding through discovery.  In an apparent reaction to the instant suit, the AG's office has made a few superficial changes in its conduct of that litigation.  For example, Ms. Natter now appears in court and participates in "a weekly conference call" with outside counsel.  (*See, e.g.*, Natter Dep. 308:19-309:3.)  Ms. Natter also claims that "a larger percentage of [her] time is involved in the [KCPA action] than it was in the MDL" proceeding and that she "now physically sign[s] all pleadings" in that case.  (*Id.* 233:17-18, 234:9-10.)  And when the Commonwealth renewed its contract with Garmer & Prather in July 2012, it retained the language that contingency-fee counsel "assum[es] [the] lead role in investigating and . . . preparing litigation" against Merck (along with the lengthy list of duties that follows), but it added a proviso that the AG shall have "final authority over all aspects of this litigation" and that "[t]he Attorney General may provide attorneys and other staff members to assist Contractor with this litigation."  (2012 Contract at 4-5 (attached as Ex. 15).)  As later revealed in deposition, the AG's office considered these revisions "a good idea" in light of the lawsuit filed by Merck. (Natter Dep. 231:18-232:6.)

---

[5]      In its motions to dismiss, the AG has also asserted several non-merits-based grounds for dismissal, none of which has been accepted by the Court.  Specifically, in the first motion, the AG argued that Merck lacked standing to sue the AG because its injury was too speculative and the case was not ripe for judicial review.  (*See* Mem. In Supp. of Commonwealth's Mot. to Dismiss, ECF No. 17-1.)  The AG also asserted that the Court should exercise its discretion to abstain from considering Merck's constitutional challenge pursuant to the *Pullman* and *Burford* abstention doctrines.  The Court rejected each of these arguments.  (*See* Order Denying Preliminary Injunction at 6-7, 9-10 ECF No. 31.)  The AG also filed a renewed motion to dismiss in April 2012, this time arguing that abstention was appropriate pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), which the Court denied in December of 2012.  (Order Denying Motion to Dismiss at 11-12, ECF No. 57.)

Notwithstanding these cosmetic changes, the AG's office has continued to let its outside counsel direct the KCPA action.  Although Ms. Natter repeatedly offered generic assertions to the effect that the AG's office has the "final word" on all litigation decisions in the KCPA action at her deposition (*e.g.*, *id.* 315:19), the reality is that essential decisions in that case are controlled by outside counsel, not the AG's office.  For example, Ms. Natter demonstrated no substantive knowledge of any of the 45 alleged violations that form the core of the KCPA action.  (*Id.* 267:7-268:6.)  The list of violations was assembled exclusively by outside counsel in the course of their review of thousands of documents produced by Merck.  (*Id.* 264:20-21 ("Outside counsel sent this list to me.").)  No Kentucky AG attorney ever reviewed the underlying documents in support of any of these allegations, and Ms. Natter – the AG attorney "most knowledgeable" about the KCPA action – was only able to testify that she was generally familiar with the "boilerplate" descriptions of each separate violation.  (*Id.* 268:7-14, 276:11-277:16.)  When shown three of the documents on the list that allegedly violated the KCPA, Ms. Natter testified that she could not recall having seen a single one of them.  (*See id.* 279:4-284:1.)  And when asked to identify "anything . . . that is false or misleading" in one such document, she could not do so.  (*Id.* 281:20-282:5 (initially stating that she "probably can" but, upon reviewing the document, testifying that "I don't want to testify regarding any specifics relating to this article").)

Ms. Natter claimed that the AG's office "approved" the list of claimed violations – apparently intending to suggest an exercise of its "final authority" over the litigation (2012 Contract at 4) – but no attorney from the AG's office either added or removed even a single violation from the list prepared by outside counsel (Natter Dep. 276:17-20, 323:9-23).  Indeed, the list of violations is identical to the one produced by the same outside counsel on behalf of the State of Alaska, confirming that the Kentucky AG's office had absolutely no input in preparing it.

12

(*Compare generally*, Appendix A to Kentucky Discovery Responses *with* Appendix A to Alaska Discovery Responses (attached collectively as Ex. 16).)  This fact is notable because Ms. Natter claimed earlier in her deposition that one measure of the AG's control of the litigation was its habit of "mak[ing] changes" and "add[ing] arguments" to "positions and briefs" authored by outside counsel.  (Natter Dep. 195:15-18.)

Similarly, Ms. Natter knew next to nothing about the 65 witnesses on the Commonwealth's good-faith witness list in the KCPA action – i.e., the list of individuals that the Commonwealth may call on its behalf at trial.  (*Id.* 247:11-17.)  Although Ms. Natter claims that she "approv[ed]" the witness list and was "generally aware of the methodology" used to devise it (*id.* 248:2-18), she could only identify five to seven of the 65 witnesses (*id.* 252:9-17).  She did not know nearly 60 witnesses selected by outside counsel; nor could she describe their alleged role in the promotion of Vioxx.  (*Id.* 258:13-259:24; *see also id.* 249:3-12 (**Q:**  "You can't tell me who most of these people are; correct?"  **A:**  "I'm sure I cannot . . . [t]here are certainly plenty of names on here that I don't know.").)  And once again, neither Ms. Natter nor any other attorney from the AG's office removed a single witness from the list compiled by outside counsel.  (*Id.* 260:1-8.)  Ms. Natter was likewise unable to confirm whether the Commonwealth has formally retained experts in the KCPA litigation.  (*Id.* 305:15-306:7.)

The AG's office was similarly uninvolved in preparing a list of 12 witnesses in response to an interrogatory in which Merck asked the Commonwealth to identify the witnesses who had information relevant to its allegations that Merck engaged in unfair and deceptive trade practices.  (*Id.* 237:15-244:12.)  No attorney from the AG's office contributed any of the names included in the response to the interrogatory.  (*Id.* 237:15-238:2.)  Outside counsel "did factual investigation, reviewed documents, [and] reviewed depositions" in order to prepare the list.  (*Id.* 246:4-6.)

Although Ms. Natter once again claimed to have approved the list and the methodology used to compile it, she admitted that she "did not know in particular . . . who each of these [witnesses] are."  (*Id.* 246:4-12.)

## ARGUMENT

Where the plaintiff moves for summary judgment, the motion shall be granted "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 294 F. Supp. 2d 896, 898 (E.D. Ky. 2003), *aff'd*, 441 F.3d 416 (6th Cir. 2006) (quoting Fed. R. Civ. P. 56).

"Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material."  *Earley v. Sunbeam Prods., Inc.*, No. 3:07-CV-545-S, 2008 U.S. Dist. LEXIS 14970, at *2 (W.D. Ky. Feb. 26, 2008).  A material factual dispute must involve "facts which, under the substantive law governing the issue, might affect the outcome of the suit."  *Id.*

Even as to material facts, "the non-moving party must do more than merely show that there is some 'metaphysical doubt.'"  *W. Ky. Royalty Trust v. Armstrong Coal Reserves, Inc.*, No. 4:11-CV-114-M, 2012 U.S. Dist. LEXIS 168476, at *6-7 (W.D. Ky. Nov. 27, 2012) (citation omitted) (granting in part plaintiff's motion for summary judgment).  "Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by 'citing to particular parts of materials in the record' or by 'showing that the materials cited do not establish the absence . . . of a genuine dispute[.]'"  *Id.* (citing Fed. R. Civ. P. 56(c)(1)).  In short, "[a] mere scintilla of evidence is insufficient; 'there must be evidence on which the jury could reasonably find for the [nonmovant].'"  *Brown v. Lexington-Fayette Urban County Gov't Dep't of Pub. Works*, No. 5:08-cv-500-JMH, 2012 U.S. Dist. LEXIS

14

159241, at *7 (E.D. Ky. Nov. 5, 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Where the plaintiff is entitled to summary judgment as to a constitutional claim, injunctive relief should follow if the plaintiff would suffer continuing irreparable injury absent an injunction, and there exists no adequate remedy at law. *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 355 (6th Cir. 2010) (affirming plaintiff's motion for summary judgment as to procedural due process claim and district court's issuance of permanent injunction; plaintiff "suffered a constitutional violation and will continue to suffer irreparable injury for which there is not an adequate remedy at law").

As set forth below, Merck is entitled to summary judgment on the merits of its due process claim because the facts establish beyond any genuine dispute that outside counsel prosecuting this action has "invaded the sphere of control" reserved to the AG's office. (*See* Mem. Op. & Order at 8, ECF No. 32 (citing *Cnty. of Santa Clara v. Superior Court*, 74 Cal. Rptr. 3d 842, 853 (Cal. Ct. App. 2008)).) Moreover, because Merck will suffer irreparable injury if it is forced to defend itself in a biased proceeding and there are no other adequate remedies at law, the proper remedy is a permanent injunction enjoining the Commonwealth from pursuing its state-court action against Merck with contingency-fee counsel.

## I.   THE KENTUCKY AG'S CONTINGENCY-FEE ARRANGEMENT VIOLATES MERCK'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.

The Supreme Court has long held that a state violates due process when it deprives a defendant of an impartial tribunal. *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927) ("it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case"). This

requirement applies not only to judges, but to prosecutors and private attorneys representing the government. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980) (rejecting constitutional challenge but nonetheless recognizing requirement of neutrality and impartiality in enforcement proceeding; "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions" ); *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 804-06 (1987) (holding that private attorneys appointed as special prosecutors in a criminal contempt action were subject to the same standard of impartiality as government employees; "to pursue the public interest," private attorneys representing the United States "certainly should be as disinterested as a public prosecutor who undertakes such a prosecution."). The right to an impartial tribunal is not limited to criminal proceedings, but also applies to civil actions that are penal in nature. *People ex rel. Clancy v. Superior Court*, 705 P.2d 347, 348-51, 353 (Cal. 1985) (invalidating contingency-fee arrangement in nuisance abatement action where the retention agreement, which provided that the private firm's hourly rate would double if the City were successful in the litigation, "[o]bviously" gave outside counsel "an interest extraneous to his official function in the actions he prosecutes on behalf of the City" and was therefore "antithetical to the standard of neutrality that an attorney representing the government must meet").

Consistent with these principles, this Court has already concluded that "the KCPA action against Merck is penal in nature and thus implicates the requirement of neutrality." (Order Denying Motion for Preliminary Injunction at 17.) As such, a contingency-fee arrangement between the AG and outside counsel is constitutionally permissible only "if the government attorney or prosecutor retains 'full control over the course of the litigation[.]'" (*Id.* at 18 (citation

16

omitted ).)  "Thus, the fundamental inquiry in this case concerns the issue of control over the litigation."  (*Id.*)

In order for a contingency-fee arrangement to pass constitutional muster in this context, courts have outlined several requirements "to ensure that public attorneys exercise real rather than illusory control over contingent-fee counsel."  *County of Santa Clara v. Super. Ct.*, 235 P.3d 21, 39 (Cal. 2010).  **First**, the contingent-fee retention agreement "must provide explicitly that all critical discretionary decisions will be made by public attorneys" in specific rather than "boilerplate" terms.  *Id.* at 37, 39 & n.13.  **Second**, the Attorney General's Office must in fact "retain complete control over the course and conduct of the case."  *See id.* at 40.  And **third**, "not only must the Attorney General have absolute control over all stages of the litigation, but he or she must also *appear* to the citizenry of [Kentucky] and to the world at large to be exercising such control."  *State v. Lead Indus. Ass'n*, 951 A.2d 428, 477 (R.I. 2008).  These guidelines are not "exhaustive"; rather, they provide the "minimum requirements . . . adequate to ensure that critical governmental authority is not improperly delegated to an attorney possessing a personal pecuniary interest in the case."  *Santa Clara*, 235 P.3d at 40.[6]

As discussed in greater detail below, the contingency-fee arrangement between the AG's office and outside counsel fails to comport with these minimum requirements.  Accordingly, the agreement violates Merck's due process right to an impartial tribunal.

---

[6]     Decisions by the Sixth Circuit and the Kentucky Supreme Court confirm that governmental control is essential to preserving neutrality, but Merck has found no decision from these courts that elaborates the indicia of control.  *See Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983) (explaining that retention of outside counsel to assist with a criminal prosecution is not a "per se" violation of due process but noting that Kentucky law safeguards against abuse because it "requires the public prosecutor to **retain control** over the conduct of the trial"); *Commonwealth v. Hubbard*, 777 S.W.2d 882, 883 (Ky. 1989) (approving use of outside counsel where "the Commonwealth Attorney's office maintained control over the prosecution of the case").

## A.   The Contract With Outside Counsel Does Not Ensure The Exercise Of Real Control By The AG's Office.

First, in order "to ensure that the heightened standard of neutrality is maintained in the prosecution of" the "action, contingent fee agreements between public entities and private counsel must contain specific provisions delineating the proper division of responsibility between the public and private attorneys." *Santa Clara*, 235 P.3d at 37 n.13.  These provisions "must provide explicitly that all critical discretionary decisions will be made by public attorneys – most notably, any decision regarding the ultimate disposition of the case." *Id.*

The requisite contractual language must go beyond mere "boilerplate language regarding 'control' or 'supervision,' by identifying certain critical matters regarding the litigation that contingent-fee counsel must present to government attorneys for decision." *Id.* at 39.  At a minimum, the contract "must specifically provide that decisions regarding settlement of the case are reserved *exclusively* to the discretion of the public entity's own attorneys." *Id.* at 39 (emphasis added).  The contract must also "specify that any defendant that is the subject of such litigation may contact the lead government attorneys directly, without having to confer with contingent-fee counsel." *Id.* at 39-40 (citing ABA Formal Ethics Op. 06-443 (Aug. 5, 2006)). And the contract must also provide that the government retains veto power over all decisions made by outside counsel and that a government attorney with supervisory authority is personally involved in overseeing the litigation. *Id.* at 40; *Lead Indus. Ass'n*, 951 A.2d at 477.  Such provisions constitute critical protections because the attorney-client privilege makes "violations of the 'control' exception . . . difficult to detect." *Santa Clara*, 235 P.3d at 39.[7]

---

[7]     This "practical concern" expressed by the *Santa Clara* court, 235 P.3d at 39, has been amply vindicated in this suit, in which the AG's office initially refused to submit to a deposition on the ground that all matters relating to control were covered by attorney-client privilege (*see* Letter from Clay Barkley to Magistrate Judge Edward B. Atkins at 3, Oct. 2, 2012 (attached as Ex. 17) (claiming that only three of seven proposed deposition topics related to the issue of control and that all "three seek privileged information")), and then, after relenting and offering a

*(cont'd)*

The contracts here fail these basic requirements.  In particular, nothing in the contracts provides that Merck "may contact the lead government attorneys directly, without having to confer with contingent-fee counsel."  To the contrary, the AG's office has taken the position in this case that the existence of the contracts made it improper for Merck's counsel to contact the AG's office directly with respect to settlement of the KCPA litigation.  Indeed, outside counsel demanded in an interrogatory that Merck explain why it "hired Terry McBrayer to meet with the Attorney General to discuss settlement of the Commonwealth's KCPA litigation if the Attorney General did not 'control' the litigation" (Def.'s First Reqs., Interrog. No. 9), and suggested that the AG's office considers it unethical for Merck to contact the AG directly because it is represented by outside counsel (*see id.* (citing Ky. Sup. Ct. R. 3.130(4.2) (relating to communications with other persons represented by counsel))).[8]

The contracts are also deficient with respect to the division of responsibilities.  Indeed, the contracts do not appear to "divide" responsibilities at all, but rather vest responsibility for the "lead role" of the litigation as to "all phases of investigation and litigation" in outside counsel. (*E.g.*, 2010 Contract at 3-4.)  *See Santa Clara*, 235 P.3d at 41 (holding that retention agreements would have to be revised because none of the ten contracts before the court "contain[ed] the . . . specific provisions regarding . . . division of responsibility that we conclude are required to safeguard against abuse of the judicial process").

_____

*(cont'd from previous page)*

30(b)(6) witness, asserted the attorney-client, work-product and common-interest privileges several times in the deposition (*see generally* Natter Dep.).

[8]      The AG's office is clearly wrong in suggesting that there was any misconduct by Merck's counsel. Kentucky Supreme Court Rule 3.130(4.2) is a verbatim adoption of the ABA's Model Rule 4.2.  As the California Supreme Court explained in *Santa Clara*, the ABA has already clarified in a formal ethics opinion that Rule 4.2 "'does not prohibit a lawyer who represents a client in a matter involving an organization from communicating with the organization's inside counsel about the subject of the representation without obtaining the prior consent of the entity's outside counsel.'"  235 P.3d at 40 & n.16 (quoting ABA Formal Ethics Op. 06-443).

Nor are the contracts sufficient with respect to the exclusive authority to settle.  To be sure, both contracts include one sentence generically reserving rights "to direct the litigation in all respects," including "approval and/or rejection of settlements" (2010 Contract at 3); and the 2012 contract adds the proviso that the AG's office has "final authority over all aspects of this litigation" (2012 Contract at 4-5).  But neither includes language ensuring that the decision to resolve the litigation is left "*exclusively* to the discretion" of the AG's office; the language *reserves* the right of the AG's office to make settlement decisions, but does not guarantee that the office will exercise that right.  And the potential for usurpation is stark, particularly in light of the contracts' express directive that outside counsel is to take a "lead role" in, among other things, "represent[ing] the Commonwealth in trial or in any settlement negotiations that may occur."  (*E.g.*, 2010 Contract at 3-4.)

Finally, neither of the contracts expressly provides for the personal involvement of the AG's office in "all stages of the litigation."  *Lead Indus. Ass'n*, 951 A.2d at 477.  If anything, they do the opposite, by omitting any mention of the AG Office's day-to-day responsibilities, while expressly providing that it is outside counsel who must be involved in "all phases of investigation and litigation."  (2010 Contract at 3; 2012 Contract at 5.)

Accordingly, even without looking any further at the conduct of the AG's office in the KCPA action, its agreement with outside counsel is facially invalid as a matter of due process.

### B.      The Attorney General's Office Does Not Retain Complete Control Over the Course And Conduct Of The Case.

Second, irrespective of the text of the retainer agreement, the AG's office must in fact "retain[] *absolute and total control over all critical decision-making*."  *Lead Indus. Ass'n*, 951 A.2d at 475.  (*Accord* Order Denying Preliminary Injunction at 18, ECF No. 31 ("[A] significant factor to consider when evaluating a contingency fee arrangement such as the one here is the

extent to which the attorney general exercises control over the litigation.").)  Here, discovery has revealed that the AG's office knows next to nothing about the alleged violations being prosecuted by outside counsel or what witnesses they plan to present to prove these violations. Needless to say, the AG's office cannot control critical decision-making when it knows virtually nothing about the lawsuit it is supposed to be directing.

The question of who controls the KCPA action is critical to determining whether due process has been violated because "there is a critical distinction" between an employment arrangement in which "[p]rivate counsel serv[e] in a subordinate role" that does not "supplant a public entity's government attorneys" and an arrangement "that fully delegates governmental authority to a private party possessing a personal interest in the case." *Santa Clara*, 235 P.3d at 36.  The former arrangement protects due process; the latter violates it.  As one court explained, the "pecuniary interest" of private contingency-fee counsel "in the outcome of the case," creates "a conflict of interest that potentially places their personal interests at odds with the interests of the public and of defendants in ensuring that a public prosecution is pursued in a manner that serves the public, rather than serving a private interest." *Id.*; *see also, e.g.*, *Lead Indus. Ass'n*, 951 A.2d at 476 (while "attorneys general are charged with the special duty to seek justice . . . [t]he usual advocate . . . is not held to quite such an abnegatory and demanding standard"). Because the danger posed by contingent-fee agreements flows from the incentive created to drive up monetary relief, among the "critical discretionary decisions" that must remain within the government's control are those that pose the risk "that private attorneys unilaterally will engage in inappropriate prosecutorial strategy and tactics geared to maximize their monetary reward." *Santa Clara*, 235 P.3d at 38-39.

21

Here, the AG's office has abdicated control over the very matters that bear most directly on the potential "monetary reward."  As the Court has previously observed, the KCPA action seeks penalties, and such penalties are calculated based on the number of KCPA violations. (Order Denying Preliminary Injunction at 16-17.)  Not surprisingly, outside counsel in this case have attempted to multiply the number of alleged KCPA violations in order to maximize their potential recovery.  Although the entire complaint in the KCPA action is only eight pages long and includes only 26 paragraphs in factual allegations, outside counsel have developed a list of 45 supposed violations of the KCPA, many of which are not mentioned in the Complaint.  (*See* Natter Dep. Ex. 11, App. A (attached as Ex. 18).)  Remarkably, the AG's office did nothing to scrutinize that endeavor.  No Kentucky AG attorney ever reviewed the underlying documents in support of any of these allegations, and Ms. Natter – the AG attorney "most knowledgeable" about the KCPA action – was only able to testify that she was generally familiar with the "boilerplate" descriptions of each separate violation.  (Natter Dep. 268:7-14, 276:11-277:17.)  Moreover, as noted above, the list is identical to the one produced by the same outside counsel on behalf of the State of Alaska, making it clear that the AG had no input in developing it.

The AG's unfamiliarity with the core allegations underlying its suit is consistent with its general absence in "all stages of the litigation."  *Lead Indus. Ass'n*, 951 A.2d at 477; *Santa Clara*, 235 P.3d at 40.[9]  During the entire time the KCPA action was pending in the federal Vioxx MDL proceeding, there was almost no personal involvement by the AG's office.  As noted above, all court appearances were made by outside counsel, all correspondence was signed by outside counsel, and all court submissions were made by outside counsel.  Ms. Natter's entire

---

[9]     The courts adopting this requirement have couched it as a required term of any retention agreement with outside counsel, but they obviously did so with the expectation that the written terms of the contract would bind and
*(cont'd)*

contribution to the court proceedings on the record in the MDL consists of her introduction of

herself on one phone call.  (Natter Dep. 221:10-223:5.)  Her overall participation in those

proceedings was so insubstantial that she had to admit that her recall of the entire MDL phase of

the litigation is "fuzzy."  (*Id.* 17:16.)

Ms. Natter claims to have expanded her personal involvement in the litigation since its

return to state court, but to this day, she remains unaware of the factual details underlying the

central allegations of the short complaint that she essentially copied from another case.  (*See, e.g.*,

*id.* 146:16-147:18.)[10]  Nor is Ms. Natter aware of basic details concerning outside counsel's

preparation for trial in the KCPA action since remand to state court.  She could not confirm

whether the Commonwealth has formally retained experts in the KCPA litigation.  (*Id.* 134:15-

135:8, 305:15-306:7.)  Nor did she have any knowledge concerning the vast majority of

witnesses on outside counsel's good-faith witness list.  (*Id.* 248:2-18, 252:9-17, 246:4-12.)

Although she claims to have "approved" the work of outside counsel, she did not offer any

substantive revisions on outside counsel's proposed witness lists.  (*Id.* 237:15-238:2, 260:1-8.)

And it was outside counsel who prepared the Commonwealth's good-faith witness list and

identified additional witnesses with relevant information.  (*Id.* 237:15-244:12, 247:11-17, 267:7-

268:6.)

In short, the AG cannot be in control of litigation about which its most "knowledgeable"

attorney knows almost nothing.  Rather than control its action against Merck, the AG has served

_____

*(cont'd from previous page)*

guide the conduct of government attorneys.  *Cf. Santa Clara*, 235 P.3d at 39 (stating the court's assumption that government attorneys will follow the terms of the retention agreements absent contrary evidence).

[10]     Ms. Natter claimed that she "did not see this [i.e., explaining the factual allegations in the complaint] as the purpose of this deposition."  (Natter Dep. 139:14-22, 148:4-8.)  But this response only underscores the problem. Presumably, the Commonwealth's designated 30(b)(6) witness and the attorney "most involved" in the KCPA litigation would not have to undertake rigorous preparation to answer basic questions pertaining to ***her own*** lawsuit.

in a "subordinate role," "fully delegat[ing]" its authority to outside counsel in violation of Merck's due process rights.  *Santa Clara*, 235 P.3d at 36.  For this reason too, Merck is entitled to summary judgment.

### C.    The AG's Office Does Not Appear To Be Exercising Control Because All Communications And Appearances Are Directed By Outside Counsel.

"[N]ot only must the Attorney General have absolute control over all stages of the litigation, but he or she must also *appear* to the citizenry of [Kentucky] and to the world at large to be exercising such control."  *Lead Indus. Ass'n*, 951 A.2d at 477.  This is so because "'[j]ustice must satisfy the appearance of justice.'"  *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).  There is no appearance of control by the AG in this case.  This was particularly so while the KCPA action was pending in the MDL proceeding, where – as noted previously – the AG had no discernible presence in the proceedings.

It remains that way today, despite Ms. Natter's new practice of physically appearing in court.  The retention agreements, for example, still state that outside counsel must take the "lead role" in "all phases of investigation and litigation."  (*E.g.*, 2012 Contract at 5.)  Thus, even if it were the case that the AG's office were exercising "absolute" control over the litigation – and it is not – the contractual language does not reflect that alternate reality.  Indeed, Ms. Natter conceded as much at her deposition, testifying that the language of the contract defining the responsibilities of outside counsel "might be broader than" the authority they are allowed in practice.  (Natter Dep. 192:7-194:24.)  Even if that were true, there would be no way for the public to know that, particularly in light of the AG's insistence on shielding the details of its relationship with outside counsel behind claims of attorney-client privilege.

For this reason too, the Commonwealth's relationship with outside counsel has contravened Merck's due process rights.

24

## II.     THE COURT SHOULD ISSUE A PERMANENT INJUNCTION.

Once a party has established that it is suffering a constitutional violation, it is entitled to permanent injunctive relief by showing:  (1) continuing irreparable injury if the court fails to issue an injunction, and (2) the lack of an adequate remedy at law.  *Warren v. City of Athens*, 411 F.3d 697, 712 (6th Cir. 2005); *Saieg v. City of Dearborn*, 641 F.3d 727, 733, 741 (6th Cir. 2011) ("A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law") (internal quotation marks and citation omitted); *Wedgewood* , 610 F.3d at 355 (similar); *ACLU of Ky. v. McCreary County*, 607 F.3d 439, 445 (6th Cir. 2010) (similar), *cert. denied*, 131 S. Ct. 1474 (2011).  This Court has ample discretion in determining the appropriate form of injunctive relief, because "[t]he scope of an injunction is within the broad discretion of the district court."  *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 (9th Cir. 2011).

Here, there is no question that Merck is entitled to a permanent injunction because the delegation of the Commonwealth's enforcement powers to an outside firm possessing a direct, pecuniary interest in the underlying lawsuit will force Merck to defend itself in an enforcement proceeding that is both unfair and subject to abuse.  Furthermore, there is no adequate remedy at law because monetary damages will not afford Merck the relief it seeks:  an unbiased enforcement proceeding.

*First*, there is no question that Merck will suffer irreparable injury absent a permanent injunction.  As a threshold matter, for purposes of granting a permanent injunction, "[w]hen the impairment of a constitutional right is at issue, no further showing of irreparable harm is necessary."  *Direct Mktg. Ass'n v. Huber*, No. 10-cv-01546-REB-CBS, 2012 U.S. Dist. LEXIS 44468, at *28 (D. Colo. Mar. 30, 2012); *Aguilar v. Immigration & Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011) (plaintiffs' claimed

constitutional violations satisfied the irreparable harm requirement because "allegations of [violations of] constitutional rights are presumed to be irreparable"); *cf. Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (there is a "presumption of irreparable injury that flows from a violation of constitutional rights . . . it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm").

Even absent this presumption of injury, Merck could easily demonstrate irreparable harm. As other courts have recognized, the prospect of having to defend oneself before a partial tribunal constitutes irreparable injury.  In *United Church of the Medical Center v. Medical Center Commission*, 689 F.2d 693 (7th Cir. 1982), for example, the appellant sought preliminary and permanent injunctive relief from title reversion proceedings conducted by a Commission charged with operating a medical center.  If the Commission determined that the property was to revert to the Medical District, all proceeds from the sale of that property would be awarded to it. *Id.* at 698-99.  The appellant argued that the proceedings were "violative of due process" because the Commission had "a direct financial stake in the outcome" of the title proceedings.  *Id.* at 696, 699.  The court agreed and reversed the district court's denial of an injunction, explaining that the Church would suffer "immediate and irreparable harm" if it were subject to the Commission's proceedings because "[s]ubmission to a fatally biased decisionmaking process is in itself a constitutional injury sufficient to warrant injunctive relief, where irreparable injury will follow in the due course of events[.]"  *Id.* at 700-01; *see also Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (affirming lower court's finding that plaintiff would suffer "irreparable injury" if she were bound by the findings of an "egregious and constitutionally infirm hearing").

A finding of irreparable injury is similarly mandated in this case because the AG has violated Merck's fundamental right to due process under the Fourteenth Amendment. Contingency-fee counsel has an obvious pecuniary interest that taints its involvement in this lawsuit.  It advances "[a]ll expenses incurred in the investigation, assessment and litigation" of the enforcement action and is not reimbursed for these costs "if nothing is received or recovered" by the Commonwealth.  (*See* Bates No. 000013; *see also* Natter Dep. 218:5-219:16 ("most of the costs are being covered by outside counsel . . . costs can be recovered if we're successful and outside counsel bears the costs if we're not").)  Furthermore, counsel recovers 18 percent of any gross recovery in this action, and receives "zero if there is no recovery."  (Natter Dep. 219:1-6.)  Thus, it has a strong incentive to pursue the maximum amount of civil penalties allowable by statute – regardless of whether such penalties are warranted under Kentucky law.

This potential bias is especially troubling because, as discussed above, the AG's office has not exercised any meaningful control in this litigation.  Outside counsel has assumed the lead role in this litigation at every turn – from reviewing and responding to discovery, to managing all communications with the MDL court and Merck.  In particular, the AG's office has not exercised any control over the selection of the alleged KCPA violations that form the core of the suit and the basis of any monetary relief in the form of penalties.  Thus, there is a substantial likelihood that outside counsel have been prosecuting, and will continue to prosecute, this action in an overzealous manner, regardless of whether "the public interest may be furthered not by continued litigation, not by gaining [monetary relief], but either by cessation of litigation or acceptance of a form of non-monetary relief."  Martin H. Redish, *Private Contingent Fee Lawyers and Public Power:  Constitutional and Political Implications*, 18 Sup. Ct. Econ. Rev. 77, 103 (2010).

***Second***, there is no adequate remedy at law that would afford Merck the relief it seeks. "Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages[.]" *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 131 S. Ct. 746 (2011); *see also Payne v. Housing Auth. of Evansville*, 821 F. Supp. 559, 560 (S.D. Ind. 1992) (where plaintiff had "shown irreparable harm by alleging a violation of his due process rights under the Fourteenth Amendment . . . [d]efendants' arguments that [plaintiff] may be compensated monetarily ignore[d] the loss of his Constitutional rights which cannot be monetarily compensated").

Here, no amount of monetary damages can redress the infringement of Merck's constitutional rights caused by the AG's delegation of authority to profit-motivated contingency-fee counsel.  As discovery in this case has made clear, it is the penalties-driven outside counsel – not the Kentucky AG – who are exercising control over the KCPA action.  This abdication of control continues to violate Merck's fundamental due process rights by subjecting it to overzealous prosecution motivated by financial gain rather than the public interest.  Because monetary damages would not eliminate the taint inherent in the KCPA action, the Court should find that Merck's only adequate remedy is a permanent injunction.

In short, Merck is entitled to an injunction to vindicate its constitutional right to a fair enforcement proceeding that is subject to the control of government attorneys.  Accordingly, the Court should enjoin the Commonwealth from litigating its KCPA claim using a contingency-fee arrangement.  Such an injunction would require the AG to either use the Commonwealth's own substantial resources to litigate this claim, or to retain outside counsel using agreements that do not call for contingency fees.  Either of these options would allow the Kentucky AG to maintain his lawsuit against Merck without infringing the Company's fundamental right to due process.

## CONCLUSION

For the foregoing reasons, Merck respectfully requests that the Court enter an order enjoining the further use of contingent-fee counsel in connection with the prosecution of its KCPA action against Merck.

Dated:  January 31, 2013

Respectfully submitted,

s/   SUSAN J. POPE
SUSAN J. POPE
WINSTON E. MILLER
FROST BROWN TODD LLC
250 W. Main Street, Suite 2800
Lexington, KY 40507-1749

and

JOHN H. BEISNER
JESSICA DAVIDSON MILLER
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005

and

TAREK ISMAIL
GOLDMAN ISMAIL TOMASELLI
BRENNAN &BAUM LLP
564 W. RANDOLPH ST., SUITE 400
CHICAGO, IL 60661

*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 31st day of January, 2013, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


/s/ Susan J. Pope
*Counsel for Plaintiff*


LEXLibrary 0106603.0570801  551290v1