ELECTRONICALLY FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

| | | |
|---|---|---|
| Merck Sharp & Dohme Corp., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE No. 11 CV 00051 (DCR) |
| | ) | *Electronically Filed* |
| Jack Conway, in his official capacity as | ) | |
| Attorney General of the Commonwealth of | ) | |
| Kentucky, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATE, MOTION TO DISMISS

Comes the Defendant, Attorney General Jack Conway, in his official capacity, by and through counsel, and tenders this Memorandum in Support of his Motion for Summary Judgment.

## INTRODUCTION

Defendant, Attorney General Jack Conway, in his official capacity, moves for summary judgment upon the conclusion of civil discovery.   Discovery between the parties has yielded no evidence that the Attorney General ("AG") either ceded control or allowed outside counsel to invade the so-called sphere of control in the state litigation, *Commonwealth v. Merck & Co., Inc.* (Franklin Circuit Court Civil Action No. 09-CI-1671), known to this Court as *Merck I*. Accordingly, since there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law, this case should be summarily adjudicated pursuant to Fed. R. Civ. P. 56.

## STATEMENT OF FACTS AND CASE BACKGROUND

The matter underlying this action arose from Merck's marketing and distribution of the prescription medication Vioxx. Attorney General Jack Conway filed suit against Merck Sharp & Dohme Corporation ("Merck") on September 28, 2009, pursuant to the Kentucky Consumer Protection Act ("KCPA"), located in Chapter 367 of the Kentucky Revised Statutes ("KRS"). [Record No. 2-2]. The Attorney General's complaint alleges that Merck willfully engaged in acts and practices that were unfair, false, misleading and/or deceptive and committed acts or practices, in trade or in commerce, that were in violation of KRS 367.170. [*Id*., p. 7]. The requested relief includes an injunction and civil penalties of two-thousand dollars ($2,000) for each violation of KRS 367.170, and ten thousand dollars ($10,000) for each violation targeted at consumers over the age of 65. [*Id*., p. 8]. These amounts represent the maximum civil penalties recoverable under the KCPA. *See* KRS §367.990(2). The Office of the Attorney General ("OAG") filed the complaint in the Circuit Court of Franklin County. However, the case was removed to the Eastern District of Kentucky on October 30, 2009. [Civil Action No. 3: 09-54, Record No. 1]. The AG contended throughout that there was no federal subject matter jurisdiction and contested the transfer to the MDL. [Exhibits H, I, and J]. The case was nevertheless transferred to the Eastern District of Louisiana on April 15, 2010, as part of the multi-district litigation ("MDL") captioned *In re Vioxx Product Liability Litigation*, MDL No. 1657. [Civil Action No. 3: 09-54, Record No. 15].

Approximately one year after the *Merck I* litigation was filed, the Office of the Attorney General decided to retain outside counsel to assist with the *Merck I* litigation due in large part to the geographic and other challenges posed by the New Orleans forum, which the AG continued

to assert was without jurisdiction.  [Exhibit A, Natter Dep. 165:18-167:4, Nov. 27, 2012].  On July 28, 2010, the Attorney General issued a Request for Proposals and a panel of employees at the Office of the Attorney General reviewed six proposals submitted in response.  [Record No. 15, p. 7].  Thereafter, on September 30, 2010, the Attorney General entered into a contract ("Original Contract") with the winning offeror, the firm of Garmer & Prather, PLLC ("Outside Counsel").  [Record No. 2-3]. [*See* Exhibit C]. Under the Original Contract, Outside Counsel agreed to be compensated by contingency fees "to be withheld from any settlement award resulting from the litigation." [*Id.*, p. 3].

Pursuant to the terms of the Original Contract, Outside Counsel agreed to "assist the [Office of the Attorney General (OAG)] with investigation and potential litigation involving Merck & Co. Inc., manufacturer of the pharmaceutical drug Vioxx and any other potentially liable parties."  [*Id.*, p. 5].  The Original Contract contained the following relevant provisions:

Legal services will include, but may not be limited to:

> Performing an assessment of the OAG's proposed litigation against Merck & Co. Inc.
>
> Assuming lead role in investigating and, if warranting, preparing litigation against Merck & Co. Inc., and other potentially responsible entities, if any. [The AG] will conduct all phases of investigation and litigation, including responding to motions, including motions to dismiss;
>
> …[D]rafting and answering discovery propounded to the Commonwealth; tracking documents obtained in discovery; coordinat[ing] litigation with other states and the federal government to promote, to the extent beneficial, a unified approach to these cases; taking depositions; defending depositions noticed by the defendants; preparing Commonwealth witnesses for depositions; responding to motions for summary judgment or other pretrial dispositive motions; identification of experts to testify in favor of the Commonwealth; preparation of expert witnesses for deposition or trial testimony; assessing the strength of legal arguments propounded by the litigants; preparation of legal arguments on motions; dealing with discovery disputes; represent the Commonwealth in trial or in any settlement negotiations that may occur; represent the Commonwealth

in trial or in any settlement negotiations that may occur; represent the Commonwealth in the appeal of any judgment or verdict rendered in any such action(s) and, if applicable, the remand from appeal(s).

[*Id.*, pp. 5-6]. Importantly, the agreement also provides:

The OAG retains the right at all times to direct the litigation in all respects; including but not limited to, whether and when to initiate litigation, against whom actions will be taken, the claims to be made in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested.

[*Id.*, p. 5].

During the pendency of the *Merck I* litigation in the New Orleans MDL, on October 21, 2010, the entire docket was stayed except for common discovery and attempts at mediation. [*In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, Record No. 54124]. The Commonwealth of Kentucky was assigned to "Group 3" of the MDL plaintiffs, which meant, in part, that its common discovery deadlines were delayed significantly because any discovery deadlines lagged behind those of Groups 1 and 2. [Natter Dep. 202:13-205:12]. The Attorney General's Office directed Outside Counsel to assist in accomplishing one main objective: remand back to Franklin Circuit Court. [Natter Dep. 172:18-173:9]. Concomitant with this objective, Outside Counsel was authorized to take action necessary to remain procedurally compliant while working to achieve remand. Outside Counsel was asked to assist in responding to formal discovery, seek informal discovery as requested by the Judge and the mediator in the MDL, and represent the Commonwealth in the mediation process. [*Id.*]. Outside counsel was also authorized to request from the Court a leave to file the Commonwealth's motion to remand. [*Id.*]. Outside Counsel worked to accomplish these objectives[1]: transmitting letters to Merck; participating in

---

[1] All actions taken by Outside Counsel were within the confines of the Original Contract and consistent with Kentucky Rules of Professional Conduct 3.130(1.2)(a): "[A] lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation."

mediations at the direction of Assistant Attorneys General from the Office of the Attorney General; participating in status conferences in the New Orleans MDL; and working to convince the U.S. District Court that the Commonwealth's remand motion should be heard. [*Id.*]. Collectively, Outside Counsel undertook these actions at the direction and with the oversight of the OAG.

On August 4, 2011, Judge Fallon, who was presiding over the Vioxx MDL in the Eastern District of Louisiana, indicated via order that he would accept briefing and hear oral argument on the Commonwealth's motion to remand to Franklin Circuit Court. [*In re Vioxx Prods. Liab. Litig.,* MDL No. 1657, Record No. 63185].  Shortly before Judge Fallon indicated that he would adjudicate the Commonwealth's remand motion, Merck retained attorney and Lexington, Kentucky lobbyist W. Terry McBrayer of the law firm of McBrayer, McGinnis, Leslie & Kirkland. [Exhibit B, McBrayer Dep. 6:18-21; 11:1-12:4].  Shortly after McBrayer was retained by Merck, he contacted the Office of the Attorney General on Merck's behalf to "make an exploratory effort to make certain the [OAG] was engaged…and then an attempted effort to settle—to make—to acknowledge the settlement offer."  [McBrayer Dep. 22:15-19].  Despite Merck's concerns that the OAG was not "engaged" in the *Merck I* litigation, McBrayer was privy to at least two conversations with Attorney General Jack Conway precisely about the *Merck I* litigation, at least one of which was an in person meeting in Louisville, Kentucky on August 2, 2011.  [McBrayer Dep. 24:25-24:7].  On behalf of Merck and with specific regard to *Merck I*, McBrayer contacted the Attorney General, and not Outside Counsel, because Attorney General Jack Conway was "the state's lawyer, and it was appropriate.  I knew, at the end of the day, the Attorney General had to sign off on a settlement and so it was the correct office to go to."  [McBrayer Dep. 23:24-24:4].   At the second meeting, again on Merck's behalf, McBrayer

learned directly from the Attorney General that there "obviously…was not much interest in settlement." [McBrayer Dep. 26:3-5]. McBrayer ultimately conceded that the issue of control was, in fact, a non-issue. When asked why he repeatedly contacted the Attorney General directly if Merck believed the Attorney General lacked control of the litigation, he stated: "It's pretty simple because it takes his signature to approve the settlement. If he doesn't sign it, it doesn't happen." [McBrayer Dep. 33:3-12].

Despite McBrayer's conversations directly with Attorney General Jack Conway in August of 2011 about *Merck I* in which McBrayer learned *directly* from the Attorney General that the Commonwealth was not interested in Merck's settlement offer, Merck filed the instant action against the Attorney General on August 16, 2011, seeking a declaratory judgment and injunctive relief. [Record No. 1]. In its complaint, Merck alleged that the Attorney General was disengaged from the litigation and delegated his coercive powers to private lawyers having a financial stake in the outcome of *Merck I*. [*Id.* ¶ 29]. As a result, Merck alleged that its right to due process under the Fourteenth Amendment was infringed. [*Id.* ¶ 30].

On January 2, 2012, the District Court for the Eastern District of Louisiana remanded the *Merck I* action to Franklin Circuit Court. *In re Vioxx Prods. Liab. Litig.,* 843 F.Supp.2d 654, 670 (E.D. La. 2012). Merck moved for permission to appeal the decision, but that motion was denied on February 24, 2012. *See In Re: Vioxx Prods. Liab.*, No. 12-90002 (5th Cir. 2012). On March 20, 2012, Judge Fallon returned the docket to Franklin Circuit Court. [*In re Vioxx Prods. Liab. Litig.,* MDL No. 1657, Record No. 63737]. Immediately after the March 20, 2012, remand, this Court issued two back-to-back memorandum opinions and orders. First, on March 21, 2012, the Court denied Merck's motion for a preliminary injunction, finding that "although [Merck I] is a civil case that would require the AG's neutrality due to its penal nature, the facts in the record do

not indicate a lack of control over the litigation on the part of the AG.  Because the AG has

retained the authority to direct the course of the action, the contingency fee counsel are not

subject to the requirement of neutrality.  Therefore, Merck has not established a substantial

likelihood that it will prevail on the merits of its constitutional claim." [Record No. 31, p. 20].

Second, on March 26, 2012, this Court issued an order denying the Commonwealth's motion to

dismiss, stating that dismissal was not warranted at that stage of the litigation.  [Record No. 32,

p. 8].

In late June 2012, the OAG's Original Contract with Outside Counsel was up for

renewal.  Pursuant to state procurement regulations, contracts are generally renewed every

biennium.  Outside Counsel and the OAG executed a second contract (the "Second Contract") in

July, 2012.[2]  In order to further clarify the Original Contract, the OAG and Outside Counsel

agreed on additional language to include in the Second Contract.  Although the OAG always

maintained control of the litigation by its actions, consistent with the express terms of the

Original Contract, the OAG revised the language of the Second Contract to increase transparency

as to the arrangement with Outside Counsel.

The following provisions were added to the Second Contract, each of which clarified the

OAG's previously established contractual right of control and oversight:

> The Attorney General shall have final authority over all aspects of this litigation,
> including the course and conduct of the case, as well as total control over all discretionary
> decisions.  The litigation may be commenced, conducted, settled, approved and ended
> only with the express approval and signature of the Attorney General.  The Attorney
> General at his sole discretion has the right to appoint a designated assistant ("Designated
> Assistant") to oversee the litigation, which appointment the Attorney General may
> modify at will.

---

[2] Though the parties agreed to the terms of Second Contract in July, 2012, they did not both formally
execute the contract until November, 2012. [See Exhibit D].

Contractor shall provide legal services to the Attorney General subject to the Approval of the Attorney General for purposes of seeking injunctive relief, monetary relief, and other relief against all entities in this litigation.

The Attorney General may provide attorneys and other staff members to assist the Contractor with this litigation. The identity and responsibilities of such personnel so assigned shall be determined solely by the Attorney General. All substantive pleadings, motions, briefs, formal documents, and agreements should bear the signature of the Attorney General or his designated assistant.

[…] All substantive pleadings motions, briefs and other material which may be filed with the court shall first be approved by the Attorney General and provided to his office in draft form in a reasonable and timely manner for review. Regular status meetings may be held as requested by the Attorney General.

[…] The Attorney General must approve in advance all aspects of this litigation and shall be included in any settlement discussions. Contractor agrees that any settlement in this case must receive the Attorney General's express prior approval in writing. Contractor shall confer with the Attorney General as early as practicable in any settlement negotiations.

[Exhibit D, p. 4].

Consistent with the terms of the Second Contract, Assistant Attorney General Elizabeth Natter serves as lead counsel on the *Merck I* case for the OAG. [Natter Dep. 195:13-22]. In this role, Natter "review[s] and approves[s] all matters of strategy" and "review[s] and approve[s] all documents filed with the court." [*Id.*]. Natter is responsible for the contents of the Commonwealth's discovery responses and reviews all discovery responses; she takes an active role in editing and drafting. [Natter Dep. 196:12-21].[3] At all times during the *Merck I* litigation, the OAG has controlled and directed the course of the litigation.

---

[3] Elizabeth Natter's Deposition, pp. 284:14-318:18, is particularly illustrative of the degree to which the Attorney General's Office maintained or exerted actual control over the *Merck I* litigation. The Defendant encourages the Court to read these pages in full to ascertain Ms. Natter's sworn testimony describing her and the office's oversight of the ongoing *Merck I* litigation. Because it would be too cumbersome to excerpt these pages wholly within the confines of this brief, the Attorney General includes this footnote in order to emphasize portions of the record that it feels irrefutably defeat Merck's claims in this litigation.

# ARGUMENT

I.  Defendant is Entitled to Summary Judgment as a Matter of Law Because There are No Genuine Issues of Material Fact.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988). The party moving for summary judgment bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970) (footnote omitted); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-588 (1986) (noting that inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party).   In a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge....The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (citation omitted); *see also Russo v. City of Cincinnati,* 953 F.2d 1036, 1041-42 (6th Cir.1992) (citing *Liberty Lobby*).

The burden on the moving party may be discharged if the moving party demonstrates that the nonmoving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339 (6th Cir.1993). If the moving party

meets this burden—then and only then—must the nonmoving party go beyond the pleadings in order to set forth specific facts showing that there is a genuine issue for trial.  *See* Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n,* 968 F.2d 606, 608-09 (6th Cir.1992) (citing *Matsushita*; *cert. denied,* 506 U.S. 1054, 113 (1993)).  Upon review of all the evidence relevant to the motion for summary judgment, a court should, after viewing the evidence in the light most favorable to the nonmoving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251-52.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

In the case at bar, the Court should grant summary judgment for the moving party, Defendant Attorney General Jack Conway.  The Plaintiff, Merck, cannot show that any genuine issue exists as to any material fact.  Even viewing the evidence before this Court in a light most favorable to Merck, Attorney General Conway is entitled to judgment as a matter of law because Merck has failed to establish an essential element of its case for which it bears the ultimate burden of proof at trial: that private counsel retained by the Attorney General in *Merck I* ever engaged in any conduct that invaded the sphere of control reserved to the Attorney General's Office.  [Record No. 32, p. 8]. The pleadings, depositions, answers to interrogatories and admissions on file are absolutely devoid of any credible evidence that the Attorney General has ceded control of the litigation to outside counsel.  At all relevant times, the Attorney General has directed the strategic and tactical course of the ongoing *Merck I* litigation.

II.    <u>Attorney General Conway Controlled the *Merck I* Litigation at All Times.</u>

Merck's current lawsuit against Attorney General Jack Conway is not the first of its kind. Federal and state courts throughout the country have previously considered the issue currently before this Court: does an Attorney General violate a defendant's constitutional rights to due process when he or she contracts with outside counsel on a contingency fee basis?  The short answer is no: such arrangements do not violate a defendant's constitutional rights to due process. However, such arrangements, at least in cases implicating the government's coercive powers, are subject to "exacting limitations." *See State v. Lead Industries Ass'n, Inc.,* 951 A.2d 428, 475 (Rhode Island 2008).  Every court that has reviewed the types of contingency fee arrangements challenged here has found that such arrangements do not violate a defendant's constitutional right to due process[4] when the contracts memorializing such agreements expressly preserve the Attorney General's right to control the litigation.  *See Generally Id.*; *State of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009); *County of Santa Clara v. Superior Court*, 50 Cal. 4th 35 (Cal. 2010); *Philip Morris Inc. v. Glendening*, 709 A.2d 1230 (Maryland 1998).

In *Lead Industries*, multi-year, complex litigation initiated in 1999 by the Rhode Island Attorney General resulted in a jury verdict favorable to the state in 2006.  *Lead Industries Ass'n*, 951 A.2d at 434.  From the inception of the litigation, the Rhode Island Attorney General retained the services of outside counsel pursuant to a contingency fee arrangement. *Id.* at 469.  In a written opinion addressing, *inter alia*, the defendants' allegation that the contingency fee arrangement between the state Attorney General and outside counsel constituted an

---

[4] Notably, the Defendant continues to believe that the federal due process clause is only implicated in contingency fee counsel cases when the coercive power of the state is used.  Given that the KCPA provides remedies for consumers to obtain relief similar to that of the Attorney General, it does not appear that the AG's coercive powers are necessarily implicated in the instant case.

unconstitutional violation of the defendants' right to due process, the Rhode Island Supreme Court succinctly concluded:

> [I]n principle, there is nothing unconstitutional or illegal or inappropriate in a contractual relationship whereby the Attorney General hires outside attorneys on a contingent fee basis to assist in litigation of certain *non-criminal matters*. Indeed, it is our view that the ability of the Attorney General to enter into such contractual relationships may well, in some circumstances, lead to results that will be beneficial to society--results which otherwise might not have been attainable.

*Id*. at 475 (emphasis added).

The *Lead Industries* Court emphasized that even though contingency fee arrangements with outside counsel in public nuisance cases were not unconstitutional or illegal or inappropriate, "due to the special duty of attorneys general to 'seek justice' and their wide discretion with respect to same, such contractual relationships must be accompanied by exacting limitations." *Id.* In expounding on these limitations, the Court stated that so long as the Attorney General retains absolute and total control over all critical decision-making in any case in which contingency fee arrangements exist, the engagement would be legally permissible. *Id.*

The California Supreme Court followed Rhode Island's lead in County of *Santa Clara v. Superior Court*:

> Additionally, we adopt, in slightly modified form, the specific guidelines set forth by the Supreme Court of Rhode Island….Specifically, contingent-fee agreements between public entities and private counsel must provide: (1) that the public-entity attorneys will retain complete control over the course and conduct of the case; (2) that government attorneys retain a veto power over any decisions made by outside counsel; and (3) that a government attorney with supervisory authority must be personally involved in overseeing the litigation.

*County of Santa Clara*, 50 Cal. 4th at 64.

Two other persuasive decisions are worth highlighting.[5]   In *Philip Morris Inc. v. Glendening*, 709 A.2d 1230 (Maryland 1998), the Maryland Court of Appeals upheld a contingency fee agreement between the State of Maryland and outside counsel in a tort action against tobacco companies.   The tobacco companies sought to invalidate the contingent fee agreement.   The decision held that "no constitutional or criminal violations [are] directly implicated here, and, hence, there is no potential conflict of interest."   *Id*. At 1242-1243 In distinguishing its holding from the *Clancy* decision, the *Philip Morris* court noted that Maryland had a statute authorizing the employment of outside counsel in extraordinary cases and that the Maryland officials had authority to control all aspects of outside counsel's handling of the litigation.   *Id.* at 1243.   The court found these facts dispositive in reaching the conclusion that the contingency fee contract with outside counsel was *not* violative of due process.   *Id.*   Like Maryland in *Philip Morris*, the Kentucky Attorney General has both statutory authority to retain outside counsel[6], and the agreement in place with outside counsel preserves the Attorney General's right to direct all aspects of the litigation.    Likewise, in *City and County of San Francisco v. Philip Morris, Inc*., 957 F.Supp. 1130 (N.D. Cal.1997) the federal district court refused to disqualify private attorneys retained by government attorneys in a civil lawsuit.   The

---

[5]  The Southern District of Ohio issued an unreported Opinion and Order in 2007, *Sherwin-Williams Company v. City of Columbus, Ohio*, that endorsed the notion that outside counsel arrangements entered into under contingency fee arrangements that "properly vest [the government attorney] with control over the litigation" are permissible. 2007 WL 2079774 at 2 (S.D. Ohio 2007).   This appears to be the only authority on this subject in the 6th Circuit.

[6]  Pursuant to the authority granted to the Attorney General for the Commonwealth of Kentucky by KRS 15.100(3), and in a manner consistent with state procurement regulations, the Commonwealth issued a Request for Proposals issued in accordance with KRS 45A.695 and the Commonwealth Finance Cabinet's Policy on Personal Service Contracts, FAP 111-43-00.   By Executive Order 2010-823, Governor of the Commonwealth Steven L. Beshear approved the Original Contract between Garmer & Prather, PLLC and the Office of the Attorney General.

court opined that since the private attorneys were acting as "co-counsel, with the plaintiffs' respective government attorneys retaining full control over the course of the litigation, concerns about the overzealousness on the part of private counsel were not valid." *Id.* at 1135.

Contracts memorializing outside counsel agreements that expressly preserve the Attorney General's right to control the litigation serve as a bulwark against constitutional challenges. In this Court's order of March 26, 2012, it stated the following in noting exceptions to this general rule:

> The AG contends that his use of outside counsel is constitutional because the contract "expressly preserve[s] the Attorney General's right to control the litigation." He maintains that "[t]he case law is clear; state attorneys general can properly engage outside counsel pursuant to contingency fee arrangements so long as the respective attorneys general retain complete control over the litigation." This is, indeed, the general rule. However, there is an exception to this rule: If there is evidence that private counsel "have ever engaged in any conduct that invaded the sphere of control" reserved to the AG's office, then the door is opened to a conclusion that the contingency fee arrangement violated the defendant's rights.

[Record No. 32, p. 7-8 (citations omitted)].

Therefore, pursuant to the Court's legal analysis, in order to deny the Attorney General's motion for summary judgment, the Court must find that while the contract between the Attorney General's office and outside counsel is sufficient in its express preservation of the OAG's right to control the *Merck I* litigation, credible evidence exists that private counsel engaged in conduct that invaded the Attorney General's sphere of control.[7] The Attorney General submits that the OAG's contract with Outside Counsel strictly preserves the AG's sphere of control.

---

[7] Black's Law Dictionary defines "control" as the direct or indirect power to direct the management and policies of a person or entity, or the power or authority to manage, direct or oversee. Black's Law Dictionary 143 (2nd Pocket ed., West 2001).

Merck cannot cite to any evidence discovered in this litigation that supports the idea that the Attorney General's Outside Counsel ever took any action that was not expressly authorized by the Original Contract or the Second Contract to carry out the contemplated representation. Nor can it cite to any evidence that the conduct of Outside Counsel was in any way inconsistent with the expressly permissible latitude built into Kentucky Rule of Professional Conduct SCR 3.130(1.2)(a), which protects the relationship of client and lawyer.  Furthermore, Merck cannot show any evidence that the Attorney General ceded control of this litigation to Outside Counsel based on the ongoing course of conduct between the OAG and Outside Counsel.  Merck is also absent any proof that Outside Counsel failed to abide by the Attorney General's direction with respect to any purported settlement of the *Merck I* litigation.  Finally, Merck's own conduct throughout the *Merck I* litigation actually eviscerates its own argument in this lawsuit: on any occasion where Merck sought to contact the Office of the Attorney General directly, it was able to do so with ease and engaged with representatives of the OAG who held a full understanding of the ongoing Vioxx litigation and the state's settlement position.  The Plaintiff's conjecture and speculation will not suffice at this summary judgment stage.  Merck has had its chance to discover any evidence that the Attorney General allowed its outside counsel to invade the so-called sphere of control but has failed.

    a.  <u>Control of the *Merck I* Litigation Has Always Been Vested in the Attorney General by Contract.</u>

The Attorney General executed two contracts with Outside Counsel regarding the litigation of *Merck I*:   the Original Contact, dated September 30, 2010, and the Second Contract, executed July 23, 2012.    [See Exhibits C and D].  Each of these contracts, by their express terms, vested final and absolute control of the *Merck I* litigation with the Office of the Attorney General.   Courts throughout the country consistently hold that contingency fee arrangements

with outside counsel, in cases implicating the coercive powers of government, are not unconstitutional, illegal, or inappropriate so long as the governmental party maintains absolute control of the litigation. *Lead Industries Ass'n,* 951 A.2d at 475. In expounding on these limitations, Rhode Island's Supreme Court emphasized that so long as the Attorney General retains absolute and total control over all critical decision-making in any case in which contingency fee arrangements exist, the engagement is legally permissible. *Id.* California's highest court's analysis concurred when it held in *Santa Clara* that constitutional contingent-fee agreements between public entities and private counsel provide: (1) that the public-entity attorneys will retain complete control over the course and conduct of the case; (2) that government attorneys retain a veto power over any decisions made by outside counsel; and (3) that a government attorney with supervisory authority must be personally involved in overseeing the litigation. *County of Santa Clara v. Superior Court,* 50 Cal. 4th at 64. And this Court's analysis in its March 26, 2012 order concluded much the same: if an Attorney General's contract with outside counsel expressly preserves his or her right to control the litigation, that attorney general has properly engaged outside counsel pursuant to a contingency fee arrangement. [Record No. 32, p. 7-8 (citations omitted)].

There can be no debate. Both the Original Contract and the Second Contract entered into between the Attorney General and Outside Counsel expressly preserve the Attorney General's right to control and direct the litigation in all respects. The Original Contract states, in pertinent part, that "the OAG retains the right at all times to direct the litigation in all respects," including settlement. [Exhibit C, p. 5]. The Second Contract provides even more clarification of the extensive control the AG retains over Outside Counsel. "The Attorney General must approve in

16

advance all aspects of this litigation and shall be included in any settlement discussions.  [Exhibit D, p. 4].

Any plain reading of these contractual provisions must yield the conclusion that Attorney General Conway's retention of Outside Counsel, paid by contingency, via this publicly-procured contract is constitutionally permissible and does not constitute a deprivation of Merck's constitutional right to due process.  These contracts include patently protective language that preserves the Attorney General's exclusive and undiminished right to control, advance, and settle the *Merck I* litigation.  The existence of these contracts alone would satisfy the reviewing courts in *Lead Industries* and *Santa Clara*, the two cases arguably most applicable to the constitutional analysis pending before this Court.

   b.   The Uncontroverted Evidence Shows that the AG Controlled the *Merck I* Litigation at All Times During the Proceeding.

As mentioned *supra,* in *Lead Industries*, the court stated that so long as the Attorney General retains absolute and total control over all critical decision-making in any case in which contingency fee arrangements exist, the engagement would be legally permissible.  *State v. Lead Industries Ass'n,* 951 A.2d at 475 (Rhode Island 2008), citing *County of Santa Clara v. Superior Court*, 74 Cal.Rptr.3d 842, 850 (Cal.Ct.App. 2008). In the case at bar, it is clear that the Attorney General has retained absolute and total control over all critical decision-making in the case.

Merck has adduced no evidence to demonstrate a genuine dispute of material fact regarding the AG's control of the *Merck I* litigation. Merck's initial disclosures list no persons with knowledge of the case other than Attorney General staff and Outside Counsel and their employees and colleagues; their discovery responses identify no witnesses. [See Exhibit G, Merck's Rule 26(a)(1)(A) Disclosures at 3-4; Exhibit E, Merck's Amended Discovery Responses at 21-22]. Throughout the different phases of the *Merck 1* litigation, the undisputed evidence

demonstrates that the Attorney General has maintained control and made all significant decisions relating to the litigation. While the outward manifestation of that control has varied during the phases of the KCPA action, due to geographic and other limitations, the scope and extent of the Attorney General's control is evident throughout all phases of the proceeding, including in Franklin Circuit Court, the MDL Court, and this Court.

There is no dispute that the Attorney General's office litigated *Merck I*, without assistance from Outside Counsel, from the complaint filing in September 2009 until its arrival in the MDL in April 2010. OAG staff drafted and filed the complaint, sought remand and opposed transfer to the MDL, filing a Motion to Lift Stay and Remand, and filing a Motion to Vacate the Conditional Transfer Order before the MDL Panel. [Natter Dep. 165:2-13; *See* Exhibit H, Plaintiff's Memorandum in Support of Motion to Lift Stay for Purpose of Remand Prior to Transfer; Exhibit I, Brief in Support of Motion to Vacate Conditional Transfer Order; Exhibit J, Reply in Support of Motion to Vacate Conditional Transfer Order].

### i. The OAG First Litigated, Then Made All Significant Decisions Concerning the Litigation in the MDL.

In the MDL, the Attorney General continued to control the litigation. OAG staff participated by telephone and through state plaintiff's liaison counsel in the MDL. [Natter Dep. 177:8-21]. The Assistant Attorneys General working on the case appeared in New Orleans by telephone and through the Commonwealth's Liaison Counsel and participated in formal discovery. [Natter Dep. 221:14 -2 23:5; 177:8-21]. Once in the MDL, OAG staff were hindered by budget issues and by the sheer volume of material coming through that was unrelated to the Commonwealth's KCPA claims.[8] [Natter Dep. 165:21 - 166:19]. A decision was made to issue a

---

[8] Indeed, much of the MDL proceedings centered on arcane Medicaid damage calculations and offsets that were not part of Kentucky's case. [Natter Dep. 290:19-291:21].

Request for Proposals to hire outside counsel, and state contracting procedures were followed in evaluating the bids that came in. [Natter Dep. 197:13 - 199:23].[9]

Once Outside Counsel was hired, the Attorney General's office continued to control all significant decisions relating to the conduct of the case.[10] The AG's office established three goals in the MDL: to remand the case back to Kentucky as sought since removal; to pursue common discovery in compliance with Judge Fallon's orders; and to engage in mediation pursuant to Judge Fallon's order. [Natter Dep. 172:4 - 173:9]. Merck has pointed to a handful of communications by Outside Counsel, unsigned by the AG, seeking documents in the MDL and communicating with Judge Fallon in the MDL. However, these communications merely carried out the Commonwealth's goals of completing informal discovery required by Judge Fallon and obtaining a ruling on the Commonwealth's motion to remand for lack of federal subject matter jurisdiction.

In the MDL, the Commonwealth participated substantially in preparing the briefs on the Motion to Remand and in opposition to Merck's Motion for Discretionary Review by the Fifth Circuit. [Natter Dep. 321:14-18; 330:24 - 331:14]. All the actions undertaken by Outside Counsel were pursuant to decisions made by the AG's Office: requesting that the stay be lifted to allow Kentucky's Motion for Remand to be filed; assisting with formal, and then conducting

---

[9]The bids were evaluated on the basis of technical merit and cost, and the winning bidder had not had contact with any members of the committee evaluating the bids. [Natter Dep. 199:18-23]. [*See* Exhibit F].

[10] The Assistant Attorney General assigned to the case has over 25 years of legal experience; as of now, eight years in Consumer Protection, and significant supervisory experience prior to working at the AG's Office. [Natter Dep. 22:6-8; 23:2-25:3]. Supervisory attorneys are briefed regularly on the case, and decisions are taken up the chain of command as necessary. [Natter Dep. 303:16-21; 304:17-23; 32:15-18 ("I am responsible for knowing what decisions I have the authority to make and what decisions need to be taken up the chain of command to be made by others.")].

informal discovery as required by the Judge; and conveying the Commonwealth's rejection of an unacceptable settlement offer. (See section II(c), *infra*.)

ii.   <u>Since Remand to State Court, the Attorney General's Office Has Personally and Visibly Participated in the *Merck I* Litigation.</u>

The Attorney General's control of the case has continued and become even more apparent and transparent since *Merck I* was sent back to Kentucky, particularly since budget considerations no longer restrict staff's in-court appearances. Since remand, an Assistant Attorney General has continued to participate in drafting as well as revising drafts of court filings, but has also signed all filings, discovery requests, and responses to ensure that the AG's control is transparent.[11] [Natter Dep. 231:2-17; 234: 9-13].   An Assistant Attorney General has appeared and participated at all hearings and conferences in Franklin Circuit Court, and has participated in all discovery conferences between the parties on offensive and defensive discovery. [Natter Dep. 307:24 - 309:3]. Attorney General staff has been involved in meetings with potential witnesses, spoken with potential experts in the case, reviewed expert reports from experts in other Vioxx cases; reviewed, drafted, and revised discovery requests and responses; reviewed summaries of depositions and task lists; participated in weekly conference calls [Natter Dep. 303:21-23]; and handled numerous phone calls and  scores of emails. [Natter Dep. 307:2 - 309:3; 321:1 - 322:18; 322:2 - 323:8; 323:2 - 324:3; 309:1 - 311:8].   In addition, Ms. Natter's supervisors are briefed on a more than weekly basis, and the Attorney General receives case briefings once a month. [Natter Dep. 303:16-21; 304:17-23]. There is no indication that Merck will argue that the Attorney General's office does not control the litigation currently.

---

[11] Except for a few communications concerning scheduling or memorializing positions previously taken, an Assistant Attorney General has also signed all letters to counsel for Merck for the sake of transparency of control since remand.

Inherent in exercising control over outside counsel is the discretion to have outside counsel perform certain tasks and to rely on their work in making decisions about the case. *See County of Santa Clara*, 50 Cal. 4th at 64. The Commonwealth has retained the "right to direct the litigation in all respects." [Natter Dep. 320:15; *See also Id.* at 320:16 - 321:1; 321:14 -3 22:17; 322:24 - 323:8].

Ms. Natter also testified that outside counsel prepares drafts and has input into the *Merck I* filings, but that those filings are revised to represent the interests of the Attorney General's Office. She stated:

> So I make decisions on behalf of the office and I have had to insert or remove arguments from legal memoranda in order to be both consistent with other positions in our office and because our office has more cases than just this one case. And, in fact, our duty is different from a private attorney litigating one case. We have to consider the – the needs and the interests of the office with respect to all of other cases when we take positions. So…yes, I do rely on outside counsel and I do also make changes on behalf of our office."

[Natter Dep. 330:24 - 331:14].

The case law clearly does not require all the work on the case to be done by the Attorney General's Office; if that were the case, there would be no purpose to retaining outside counsel. What is required is control, and Merck is unable to raise an issue of material fact regarding control.[12]

    c.   <u>No Evidence Exists Upon Which a Reasonable Fact Finder Could Conclude that Outside Counsel Invaded the Attorney General's Sphere of Control over the *Merck I* Litigation.</u>

Other than a few contacts from outside counsel regarding issues previously decided by the AG's office, Merck has offered no evidence that outside counsel "invaded the sphere of

---

[12] An attorney for the government is not required to be able to recall every detail of the underlying litigation on the spot in a deposition, either. The government attorneys are required to be in control and have veto power. *Santa Clara,* 50 Cal. 4th at 40.

control" reserved to the office of the Attorney General. [*See* Memorandum Opinion and Order, Record No.32 at 8]. In fact, the evidence clearly demonstrates that the AG has maintained control over every significant aspect of the case. [Natter Dep. 307:11 - 309:3].

### i. There is No Evidence of Invasion of Sphere of Control.

The "sphere of control" reserved to the Attorney General's office clearly includes decisions as to whether to file suit, what relief to seek, and whether to settle a case. [Natter Dep. 307:13-16]. Ms. Natter also opined that questions of strategy are within the "sphere of control" of the Attorney General's office. [Natter Dep. 307:16-23].[13]

Merck's complaint is that between August 2010, when private counsel was retained, until August 2011, when their federal due process lawsuit was filed, the Commonwealth (through its Assistant Attorneys General) did not personally appear at status conferences in the MDL,[14] and "exercised no apparent control over significant litigation decisions –in particular whether to settle the case."[15]

---

[13] During her deposition, Ms. Natter offered her opinion that "sphere of control" is a legal question, but she was testifying as a fact witness and her testimony as to legal questions is not binding on the office. In fact, "sphere of control" is a mixed question of law and fact, not within the ordinary experience of the trier of fact, where an expert opinion would be required to assist the jury. *See* Section iii below.

[14] Merck alleges "Subsequent to the appearance of outside counsel and prior to the commencement of this suit, the AG's office had no presence in the conduct of this litigation." [Exhibit E, (Plaintiff Merck, Sharp & Dohme Corp.'s Amended Objections and Responses to Defendant's First Requests for Admissions, Interrogatories and Requests for Production of Documents to Plaintiff) at 12)].

[15] Moreover, Merck must be aware that this allegation of abdication of control implies a violation on the part of outside counsel of one of the most fundamental and substantial ethical restrictions on attorneys. SCR 3.130 (1.2)(a) and commentary ("decisions…whether to settle a civil matter, must also be made by the client") In light of the overwhelming evidence to the contrary, Merck should withdraw this allegation. *See*, e.g., FRE 403; SCR 3.130(3.1 and 3.3); Motions in Limine filed contemporaneously with this Motion for Summary Judgment.

ii. The Decision to Reject the NAMFCU Settlement Was Made by the Attorney General's Office.

The Plaintiff has claimed that the Attorney General's Office "was not involved in the decision-making process" with regard to the National Association of Medicaid Fraud Units ("NAMFCU") settlement offer and cited to a letter from outside counsel declining the offer that was not cc'd to the Office of the Attorney General, as evidence probative of its claim.[16] However, Merck has no evidence to support this claim.

Moreover, there is specific testimony on this issue. Ms. Natter testified that there was a meeting on July 13, 2011, at which the NAMFCU settlement was discussed, attended by Dana Nickles, Assistant Deputy Attorney General, Todd Leatherman, Director of Consumer Protection, Maryellen Mynear, manager of the litigation branch of Consumer Protection, and others, including outside counsel. [Natter Dep. 287:5—288:11]. She further testified that the office arranged to have the Chief Deputy available by phone during the New Orleans mediation. [Natter Dep. 288:12-16]. And she testified that the decision had been made by the Office of The Attorney General to reject the NAMFCU offer, because it valued the Commonwealth's Kentucky Consumer Protection Act claim at zero. [Natter Dep. 288:18—289:5].[17] The letter

---

[16] Merck knows or should know that: 1) the NAMFCU offer must be officially accepted or declined by the Office of the Attorney General directly to the United States Attorney's office handling the matter with Merck; and 2) Assistant Attorneys General from the Commonwealth were listed on all pleadings and could be contacted by Merck at any time to discuss any concerns. Indeed, Merck did have one of its counsel contact the office and meet with the Attorney General regarding settlement; it has admitted that one of its outside counsel met with the Attorney General prior to filing the lawsuit "to ensure that the Attorney General was aware of the NAMFCU offer." [Exhibit E, at 16].

[17] Ms. Natter testified to a long-standing practice of separating Medicaid and Consumer Protection claims, and that the releases in NAMFCU offers, unlike the Merck one, generally include a carve-out for Consumer Protection claims. [Natter Dep. 286:7-19].

from Mr. Vines rejecting the settlement offer communicated a position that had been authorized by the Office of the Attorney General. [Natter Dep. 294:10-12].

### iii.   Merck Cannot Meet its Burden of Proof Without an Expert.

Moreover, Merck cannot show that the sphere of control of the AG was invaded without an expert to assist the trier of fact.  Determining whether the "sphere of control" of the Attorney General's office has been invaded requires special knowledge or skill not ordinarily possessed by the average person. While this case is not a malpractice case, malpractice cases are instructive. In Kentucky, "[e]xpert testimony is required in legal malpractice cases unless 'the negligence is so apparent that a layperson with general knowledge would have no difficulty recognizing it[.]'" *Huffman v. Baker*, 2005-CA-002031-MR, 2005-CA-002109-MR, 2006 WL 2846878 (Ky. App. Oct. 6, 2006) (citing *Stephens v. Denison,* 150 S.W.3d 80, 82 (Ky.App.2004)).

Medical negligence cases apply the same rule. In Kentucky, the test for whether an expert is required in a medical negligence case is as follows:

> ... whether the case involves a matter of science or art requiring special knowledge or skill not ordinarily possessed by the average person or is one where the common everyday experiences of the trier of the facts ... are sufficient in order to reach the proper conclusion. In the former, expert opinion testimony is ordinarily required to aid the trier of the facts; in the latter it is unnecessary.

*Thompson v. Ashland Hosp. Corp.,* 2010-CA-000801-MR, 2011 WL 2693553 (Ky. Ct. App. July 8, 2011), *review denied* (Apr. 18, 2012) (citing *Andrew v. Begley*, 203 S.W. 3d 165 (Ky App 2006).  In the case at bar, it would be impossible for a jury to determine whether the "sphere of control" reserved to the Attorney General had been invaded by outside counsel, unless outside counsel's control of the action were so obvious and egregious (or admitted by the Commonwealth) so as to be within the everyday experience of a layperson. *Id*.; *See also Blankenship v. Collier*, 302 S.W.3d 665, 672-73 (Ky. 2010).

It is clearly not within the ordinary experience of the layperson to draw fine distinctions regarding what is or is not within the control of the Attorney General. The Sixth Circuit, applying Tennessee law, upheld the dismissal of a legal malpractice case where the plaintiff failed to file an expert report. The court quoted Tennessee cases holding that "attorneys' trial strategies and motions practice are 'beyond the common knowledge of laymen.'" *Dorrough v. Tarpy*, 260 F. Appx. 862, 863 (6th Cir. 2008) (citation omitted). The court also quoted specific language regarding settlement offers: "As to communication of settlement offers, '[t]he lawyer's standard of care, except in the most extreme cases, should be proved using expert testimony.'" *Id*. (citation omitted). This is not like determining the simple contract matter of whether an attorney-client relationship exists. *See generally Innes v. Howell Corp.*, 76 F.3d 702 (6th Cir. 1996).

In the absence of such expert evidence, the Commonwealth contends that Merck could not meet its burden of proof, even if it had enough evidence to create a genuine issue of material fact.

d. Merck's Own Conduct Confirms that the Attorney General Retained Control of the *Merck I* Litigation at All Times.

Merck, as mentioned *supra*, has provided no credible evidence in support of its claims that the Office of the Attorney General ever allowed outside counsel to invade the Attorney General's sphere of control over the *Merck I* litigation.  It appears that the only meager evidence Merck can tender in support of its argument is an August 1, 2011, letter from outside counsel rejecting the NAMFCU settlement.  [See Exhibit K].  Despite Merck's protestations to this Court that its constitutional due process rights were being violated, because this letter allegedly represented some indicia of a ceding of control, Merck was simultaneously sending an agent to the Attorney General to repeatedly request that he consider the NAMFCU settlement.  Merck

cannot have it both ways – it cannot argue that the AG ceded control of settlement authority while concurrently attempting to utilize the AG's clearly retained settlement authority.  On any occasion where Merck sought to contact the Office of the Attorney General directly, it was able to do so with ease and engaged with representatives of the OAG who held a full understanding of the ongoing Vioxx litigation and the state's settlement position.

In July 2011, Merck retained Terry McBrayer as its counsel and agent to contact the Attorney General in order to ask that he settle the KCPA action.  [McBrayer Dep. 10:9-14].  Terry McBrayer is a former Kentucky Speaker of the House, Governor's Chief of Staff, and successful lobbyist. [McBrayer Dep. 8:2-10].  McBrayer, as an attorney and lobbyist, has a keen understanding of who the decision-makers are in Kentucky regarding issues such as AG settlement authority.  [McBrayer Dep. 8:16-21].  McBrayer contacted the AG's Office multiple times and had multiple meetings with the Attorney General concerning *Merck I*.   While McBrayer repeatedly approached the AG to discuss settlement, he never approached Outside Counsel, despite a long relationship with Bill Garmer. [McBrayer Dep. 32:2-8].   With respect to McBrayer's first meeting with the Attorney General, McBrayer stated that "I have – I have said that there was no discussion as far as I was concerned about the – the – the word control.  I wasn't there to talk about that." [McBrayer Dep. 28:8-11].  "And I was never there to determine whether or not they were running the show or not running the show.  I just knew at the end of the day, [the Attorney General] had to sign off on [the settlement]."  [McBrayer Dep. 36:19-22].  So it is clear that McBrayer's purpose was to broach the issue of settlement, not control of the litigation.

It is also clear that McBrayer, as an agent for Merck, knew that the AG retained control of the underlying litigation, for purposes of settlement and otherwise.  McBrayer stated that

General Jack Conway was "the state's lawyer, and it was appropriate.  I knew, at the end of the day, the Attorney General had to sign off on a settlement and so it was the correct office to go to."  [McBrayer Dep. 23:24-24:4].   In response to a question as to why McBrayer, if he did not think the Attorney General's Office was in control of the litigation, did he not contact outside counsel: "It's – it's pretty simple because it takes [the Attorney General's] signature to approve settlement.  If he doesn't sign it, it doesn't happen."  [McBrayer Dep. 33:3-12].   Ultimately, Merck knew that the AG was in control of the litigation, as did their agent, Mr. McBrayer.  Merck's actions are an indication that they did not even believe the underlying allegations in this case, that the AG abdicated his control of the *Merck I* litigation.

e.   The Second Contract, in Conjuction with a Lack of Credible Evidence Showing Loss of Control, Renders this Case Moot

Merck's complaint in this action, and the Court's denial of the AG's Motion to Dismiss were based on the terms of the Original Contract. [Record No. 32, p. 8].  That contract has since been superseded by the terms of the Second Contract, which further clarifies that the AG contractually maintains the full sphere of control of the litigation. All of Merck's allegations that the AG has not retained control of *Merck I* are based on evidence that occurred prior to the execution of the Second Contract.  Though the OAG is adamant that no constitutional violations ever occurred in this case, Merck certainly cannot claim any constitutional violations under the Second Contract.  As such, Merck's Complaint should be dismissed as moot.

Article III § 2 of the United States Constitution requires a case or controversy for a claim to be justiciable. *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997). To determine whether a case or controversy is present, "the question is 'whether the facts alleged, under all of the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the

issuance of a declaratory judgment.'" *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122 (1974).

In the Court's order dismissing Merck's motion for preliminary injunction, this court determined that Merck has standing to bring this claim [Record No. 31 at 7-8]. Although Merck may have had standing at the onset of the claim, mootness is a different inquiry and requires that standing be met at all stages of the litigation. "Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997). As a result, "the mootness inquiry must be made at every stage of a case" *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Wedgewood Ltd. Partnership I v. Township of Liberty, Ohio*, 610 F.3d 340, 348 (6th Cir. 2010).

In its complaint, Merck sought both injunctive relief and a declaratory judgment that the contract violated due process. However, "there is no actual controversy existing on a contract that has expired. An action for a declaratory judgment does not lie in a controversy that is moot." *General Elec. Co. v. Local 761, Intern. Union of Elec., Radio and Mach. Workers, AFL-CIO*, 395 F.2d 891, 895 (6th Cir. 1968); *Greif, Inc. v. MacDonald*, No. 3:06CV-312, 2007 WL 679040 at * 3 (W.D.Ky. 2007); *see also Campbell v. PMI Food Equipment Group, Inc.,* 509 F.3d 776 (6th Cir. 2007) ("The Agreement is no longer in effect and no party has any continuing obligations under it. Granting declaratory relief would therefore have no effect on the Workers' current legal interests."). Accordingly, since the contract that formed the basis of Merck's

complaint has expired, Merck's Complaint is moot.  As such, this case, if not dismissed under Defendant's summary judgment motion, should be dismissed for mootness.

## **CONCLUSION**

For the Foregoing reasons the Attorney General's Motion for Summary Judgment, or in the Alternate, Motion to Dismiss should be granted, with prejudice.

Respectfully submitted,

**JACK CONWAY**
**ATTORNEY GENERAL**

/s/ Sean Riley
Chief Deputy Attorney General
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky, 40601
(502) 696-5300

## CERTIFICATE OF SERVICE AND NOTICE OF ELECTRONIC FILING

I hereby certify that on January 31, 2013, I electronically filed the foregoing Motion with the clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Susan J. Pope
Frost Brown Todd LLC
250 West Main Street, Suite 2800
Lexington, KY  40507

Winston E. Miller
Frost Brown Todd LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202

Tarek Ismail
Goldman Ismail Tomaselli Brennan & Baum
1 North Franklin Street, Suite 625
Chicago, IL 60606

Attorneys for Plaintiff Merck & Co.

<u>/s/ Sean Riley</u>
Deputy Chief Attorney General