UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| MERCK SHARP & DOHME CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 11-51-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| JACK CONWAY, in his Official Capacity | ) | **MEMORANDUM OPINION** |
| as Attorney General of the Commonwealth | ) | **AND ORDER** |
| of Kentucky, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is pending for consideration of motions for summary judgment filed by Plaintiff Merck Sharp & Dohme Corporation ("Merck") and Defendant Kentucky Attorney General Jack Conway ("AG"). [Record Nos. 64, 65] Both parties contend that there are no genuine issues of material fact. And each asserts that it/he is entitled to judgment as a matter of law. For the reasons discussed below, the Court will grant the AG's motion and deny the relief requested by Merck.

**I.**

This action is related to Merck's marketing and distribution of the prescription medication Vioxx. The AG filed suit against Merck in the Franklin Circuit Court on September 28, 2009, pursuant to the Kentucky Consumer Protection Act ("KCPA"), located in Chapter 367 of the Kentucky Revised Statutes ("KRS"). The Complaint alleges that Merck "willfully engaged in acts and practices which are unfair, false, misleading and/or deceptive and has committed acts

-1-

or practices in trade or commerce in violation of KRS 367.170." [Record No. 2-2 ¶ 34] The requested relief includes civil penalties of "two thousand dollars ($2,000) for each violation of KRS 367.170, and ten thousand dollars ($10,000) for each violation targeted to consumers over the age of 65." [*Id.*, p. 8] These amounts represent the maximum civil penalties recoverable under the KCPA. *See* KRS § 367.990(2).

Merck removed the case to this Court on October 30, 2009. [Civil Action No. 3: 09-54-DCR, Record No. 1] The action was then transferred to the Eastern District of Louisiana on April 15, 2010, as part of the multidistrict litigation ("MDL") proceeding captioned: *In re Vioxx Product Liability Litigation*, MDL No. 1657. [Civil Action No. 3: 09-54-DCR, Record No. 15] On January 3, 2012, the District Court for the Eastern District of Louisiana granted the AG's motion to remand, concluding that the case was improperly removed. *In re Vioxx Prods. Liab. Litig.*, 843 F. Supp. 2d 654, 670 (E.D. La. 2012). Merck sought permission to appeal the decision but the Fifth Circuit denied the motion on February 24, 2012. *See In Re: Vioxx Prod. Liab.*, No. 12-90002 (5th Cir. 2012). On March 20, 2012, the case was remanded to the Franklin Circuit Court.

Approximately one year into the underlying action ("*Merck I*"), the AG retained outside counsel to assist with the Vioxx litigation. On July 28, 2010, the AG issued a "Request for Proposals" and a panel reviewed the six proposals that were submitted. Thereafter, on September 30, 2010, the AG entered into a contract with the firm Garmer & Prather, PLLC. [Record No. 1-4] The contract was approved by Governor Steven L. Beshear by Executive Order 2010-823. [*Id.*, p. 1] Under this contract (the "Original Contract"), the firm agreed to be

-2-

compensated by contingency fees "to be withheld from any settlement award resulting from th[e] litigation." [*Id.*, p. 3]

Garmer & Prather agreed to "assist the [Office of the Attorney General (OAG)] with investigation and potential litigation involving Merck & Co. Inc., manufacturer of the pharmaceutical drug Vioxx and any other potentially liable parties." [*Id.*, p. 5 (emphasis omitted)] The 2010 Contract contains the following relevant provisions:

> Legal services will include, but may not be limited to:
>
> > Performing an assessment of the OAG's proposed litigation against **Merck & Co. Inc.**
> >
> > Assuming lead role in investigating and, if warranted, preparing litigation against Merck & Co. Inc. and other potentially responsible entities, if any. [The AG] will conduct all phases of investigation and litigation including responding to motions, including motions to dismiss;
> >
> > . . . [D]rafting and answering discovery propounded to the Commonwealth; tracking documents obtained in discovery; coordinat[ing] litigation with other states and the federal government to promote, to the extent beneficial, a unified approach to these cases; taking of depositions; defending depositions noticed by the defendants; preparing Commonwealth witnesses for depositions; responding to motions for summary judgment or other pretrial dispositive motions; identification of experts to testify in favor of the Commonwealth; preparation of expert witnesses for deposition or trial testimony; assessing the strength of legal arguments propounded by the litigants; preparation of legal arguments on motions; dealing with discovery disputes; represent the Commonwealth in trial or in any settlement negotiations that may occur; represent the Commonwealth in responding to post-trial motions; represent the Commonwealth in the appeal of any judgment or verdict rendered in any such action(s) and, if applicable, the remand from appeal(s).

[*Id.*, pp. 5-6] The agreement also provides:

> **The OAG retains the right at all times to direct the litigation in all respects, including but not limited to, whether and when to initiate litigation, against whom actions will be taken, the claims to be made in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested.**

[*Id.*, p. 5 (emphasis in original)]

Merck filed this action against the AG on August 16, 2011, seeking a declaratory judgment and injunctive relief.  [Record No. 1]  The complaint alleges that the AG has "delegated [its coercive powers] to private lawyers having a clear, direct and substantial financial stake in the outcome of [*Merck I*], a punitive enforcement action that must be prosecuted in the public interest or not at all."  [*Id.* ¶ 29]  As a result, Merck asserts, its "right to due process under the Fourteenth Amendment has been infringed."  [*Id.* ¶ 30]  The Court denied Merck's motion for a preliminary injunction on March 21, 2012.  [Record No. 31]  The Court also denied the AG's motion to dismiss and renewed motion to dismiss on March 23, 2012 and December 19, 2012, respectively.  [Record Nos. 32, 57]

On July 1, 2012, after the expiration of the original contingency-fee contract, the AG entered into a new contract with Garmer & Prather, LLC.  This updated contract (the "Current Contract") contained the following additional terms:

> The Attorney General shall have final authority over all aspects of this litigation, including the course and conduct of the case, as well as total control over all discretionary decisions.  The litigation may be commenced, conducted, settled, approved, and ended only with the express approval and signature of the Attorney General.  The Attorney General at his sole discretion has the right to appoint a designated assistant ("designated assistant") to oversee the litigation, which appointment the Attorney General may modify at will.

Contractor shall provide legal services to the Attorney General subject to the approval of the Attorney General for the purposes of seeking injunctive relief, monetary relief, and other relief against all entities in this litigation. . . .

Contractor shall coordinate the provision of the legal services with the Attorney General or his designated assistant, other personnel of the Office of the Attorney General, and such others as the Attorney General may appoint as Contractor. All substantive pleadings, motions, briefs, and other material which may be filed with the court shall first be approved by the Attorney General and provided to his office in draft form in a reasonable and timely manner for review. Regular status meetings may be held as requested by the Attorney General.

Contractor shall communicate with state entities through the Office of the Attorney General unless otherwise authorized by the Attorney General designee and Merck can contact the Office of the Attorney General or his designee at any time. . . .

The Attorney General must approve in advance all aspects of this litigation and shall be included in any settlement discussions. Contractor agrees that any settlement in this case must receive the Attorney General's express prior approval in writing. Contractor shall confer with the Attorney General as early as practicable in any settlement negotiation process.

[Record No. 64-16, p. 5]

After a period of discovery, Merck and the AG filed cross motions for summary judgment. [Record Nos. 64, 65] The Court held a pretrial conference in this matter on April 30, 2013. [Record No. 103] Both parties asserted that the facts are not in dispute and that the issues raised in this action are appropriate for determination at this stage.[1]

## II.

Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

1       Although the parties expressed an interest in conducting an evidentiary hearing on the motions for summary judgment, further development of the record is not necessary.

P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The party moving for summary judgment bears the burden of showing conclusively that no genuine issue of material fact exists. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Instead, the nonmoving party must present "significant probative evidence" of a genuine dispute in order to defeat the motion for summary judgment. *Chao*, 285 F.3d at 424. The nonmoving party cannot rely upon the assertions in its pleadings; rather, it must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324. In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

### III.

As an initial matter, the Court will address the AG's argument that Merck's claims should be dismissed as moot. The Court has previously found that Merck has standing to bring this

action.  However, as the AG points out, "mootness is a different inquiry and requires that standing be met at all stages of the litigation."  [Record No. 65-1, p. 28]  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 348 (6th Cir. 2010) (internal quotations omitted).  The AG maintains that Merck's Complaint was based on the terms of the Original Contract and, therefore, the adoption of the Current Contract rendered the claims and allegations in the Complaint moot.  He contends that "Merck certainly cannot claim any constitutional violations under the Second Contract," and seeks dismissal of the action for lack of a justiciable claim.  [Record No. 65-1, p. 28]

"The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties."  *McPherson v. Mich. High School Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997).  The Court finds that a declaratory judgment or injunction would, indeed, make a difference to the parties.  Merck's lawsuit challenges the AG's retention of outside counsel on a contingency-fee basis on the grounds that the arrangement violates Merck's Fourteenth Amendment right to due process.  [Record No. 1 ¶¶ 2, 26-31]  The actual terms of the contracts between the AG and outside counsel — while certainly relevant to the resolution of this issue — are not necessary elements of Merck's claims.[2]  If the AG had altered the agreement with outside counsel to compensate them on an hourly rate in lieu of the contingency-

---

2       Moreover, the only contractual term, other than the provision regarding compensation, that was specifically referenced in the Complaint was left unchanged in the Current Contract.  [Record No. 1 ¶ 16 (quoting Original Contract)]  The Original Contract contained the following language, which is also present, unaltered, in the Current Contract: "Assuming lead role in investigating and, if warranted, preparing litigation against Merck & Co. Inc."  [Record No. 1-4, p. 5; Record No. 64-16, p. 6]

fee arrangement, this case would indeed be moot.  Changing the agreement to add some additional terms regarding control over the action, however, did not resolve the conflict between the parties.  For the reasons explained in the Court's Memorandum Opinion and Order denying Merck's motion for a preliminary injunction, Merck has standing to pursue this action.  [Record No. 31, pp. 7-8]  The Court's previous analysis is not altered by the AG's adoption of the Current Contract.  Therefore, the matter will not be dismissed for mootness.

## IV.

The Court has previously determined that the contingency-fee arrangement used by the AG in *Merck I* must satisfy the principles of neutrality which apply to attorneys prosecuting cases on behalf of the government.  [Record No. 31]  After considering the due process right to an impartial tribunal and examining the evolving application of that right from criminal cases to civil enforcement actions involving a public interest, the Court concluded that the KCPA action against Merck is penal in nature.  As such, the case implicates "'the requirement of neutrality imposed on government attorneys in certain cases.'"[3]  [*Id.*, p. 11 (quoting *People ex rel. Clancy v. Superior Court of Riverside Cnty.*, 705 P.2d 347, 350 (Cal. 1985))]  Accordingly, the Court found that Merck has a due process right to a neutral prosecution, free from any "financial arrangement that would tempt the government attorney," or his outside counsel, "to

---

3       The Court conducted this analysis in its March 21, 2012 Memorandum Opinion and Order denying Merck's motion for a preliminary injunction.  [Record No. 31]  In his response to that motion, the AG argued that the Court should not "impute the special obligations state attorneys general hold with respect to criminal proceedings onto . . . their litigation of civil cases."  [Record No. 15, pp. 11-12 (emphasis omitted)]  Although the AG re-asserts his belief that the "AG's coercive powers are [not] necessarily implicated in the instant case," his motion for summary judgment does not contain a substantive argument on this issue.  Therefore, although the Court's March 21, 2012 Opinion was not a final decision on the merits, the Court sees no reason to revisit its conclusions regarding the applicability of the principle of neutrality to *Merck I*.

tip the scale." *Clancy*, 705 P.2d at 352; *see City & Cnty. of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1135 (N.D. Cal. 1997) ("[A] government attorney may be disqualified if he or she has a personal interest in the litigation extraneous to his or her official functions.").

An attorney general does not necessarily violate a defendant's due process rights by hiring outside counsel on a contingency-fee basis. *See Clancy*, 705 P.2d at 352 ("Nothing we say herein should be construed as preventing the government, under appropriate circumstances, from engaging private counsel."). Most courts that have considered the issue have determined that such arrangements "are permissible if certain criteria are met." Leah Godesky, Note, *State Attorneys General and Contingency Fee Arrangements: An Affront to the Neutrality Doctrine?*, 42 Colum. J.L. & Soc. Probs. 587, 590 (2009). Thus, as long as the required safeguards are in place, a government entity may engage contingency-fee counsel to assist in a civil prosecution without infringing on the defendant's due process rights.

But there is a "critical distinction between a private attorney who *supplants* the public entity's 'duly authorized counsel' and a private attorney who serves only in a *subordinate* role as 'co-counsel' to the public entity." *Cnty. of Santa Clara v. Superior Court*, 74 Cal. Rptr. 3d 842, 852 (Cal. Ct. App. 2008). If the attorney general retains "full control over the course of the litigation," then the right to an impartial tribunal is not infringed by the contingency-fee arrangement. *Philip Morris*, 957 F. Supp. at 1135; *see State v. Lead Indus. Ass'n*, 951 A.2d 428, 475 (R.I. 2008) (explaining that contingency fee agreements can be constitutional "so long as the Office of Attorney General retains absolute and total control over all critical decision-making" (emphasis omitted)).

As a result, the Court must consider whether either the AG's arrangement with outside counsel has violated the requirement of neutrality. First, the Court will look to the terms of the contingency-fee contracts themselves to determine whether the agreements contain the proper guidelines to ensure that outside counsel's "profit-making motivation is always subordinated to the Attorney General's common law duty to represent the public interest." *Lead Indus.*, 951 A.2d at 480 (internal quotation marks omitted). If the agreement contains sufficient safeguards, then the Court will review the evidence cited by the parties to determine the AG's actual level of control over the *Merck I* litigation. In performing this analysis, the Court will ask if the private attorneys "have ever engaged in any conduct that invaded the sphere of control" reserved to the AG's office. *Santa Clara*, 74 Cal. Rptr. 3d at 853.

A.     **The Agreements**

Merck contends that the contingency-fee arrangement violates the principles of due process, arguing that both of the AG's contracts with outside counsel fail to meet the minimum requirements for constitutionality. The AG, on the other hand, asserts that both of the contracts "vested final and absolute control of the *Merck I* litigation with the Office of the Attorney General." [Record No. 65-1, p. 15] As a result, he maintains that the existence of these contracts alone should satisfy the Court's inquiry concerning the constitutionality of the contingency-fee arrangement.

Decisions from various jurisdictions outline the basic requirements for public entities to engage private counsel on a contingency-fee basis without violating a defendant's right to due process. In *Lead Industries*, the Supreme Court of Rhode Island concluded that a contingency-

fee contract must specifically ensure that "the Attorney General's discretionary decision-making must not be delegated to the control of outside counsel; rather, it is the outside counsel who must serve in a subordinate role." 951 A.2d at 476. Thus, the court set out the following limitations that should be "expressly set forth" in any such agreement: (1) "that the Office of the Attorney General will retain complete control over the course and conduct of the case"; (2) that the AG "retains a veto power over any decisions made by outside counsel"; and (3) "that a senior member of the Attorney General's staff must be personally involved in all stages of the litigation." *Id.* at 477. The court cautioned that "the presence of such limitations in a particular contingent fee arrangement is not a guarantee that the agreement will pass muster." *Id.* at 477 n.52. And it emphasized the importance of conducting a careful review of such agreements on a case-by-case basis. *Id.*

In *County of Santa Clara v. Superior Court*, 235 P.3d 21 (Cal. 2010), the Supreme Court of California also concluded that "retainer agreements providing for contingent-fee retention should encompass more than boilerplate language regarding 'control' or 'supervision' by identifying certain critical matters regarding the litigation that contingent-fee counsel must present to government attorneys for decision." *Id.* at 39. The court adopted the guidelines set out in *Lead Industries*, but added specific provisions that should be included in cases where the primary remedy sought is damages. *Id.* at 39-40. Specifically, the court opined that contingency-fee agreements must "provide that decisions regarding settlement of the case are reserved exclusively to the discretion of the public entity's own attorneys. Similarly, such

agreements must specify that any defendant that is the subject of such litigation may contact the lead government attorneys directly, without having to confer with contingent-fee counsel." *Id.*

Like the court in *Lead Industries*, the *Santa Clara* court counseled that these "requisite specific provisions . . . are not comprehensive panaceas and may not all operate perfectly in the context of every contingent-fee situation, but each of them will assist parties and the court in assessing whether private counsel are abusing their prosecutorial office." *Id.* at 39.  Accordingly, while the Court will look to the principles outlined in *Lead Industries* and *Santa Clara* for guidance in analyzing the AG's contract with outside counsel, it does not view the cases as setting out binding requirements that the Court must rigidly apply to the contracts in this case.

Merck contends that the AG's contracts fail to meet the basic requirements described above.  First, it argues that "nothing in the contracts provides that Merck may contact the lead government attorneys directly."[4]  [Record No. 64-1, p. 19 (internal quotation marks omitted)] It is true that the Original Contract did not contain such a provision.  However, the language of the currently operative contract controls the Court's analysis regarding the constitutionality of

---

4       According to Merck, the AG has taken the position that "the existence of the contracts made it improper for Merck's counsel to contact the AG's office directly."  [Record No. 71, p. 5]  Merck points to the AG's first set of interrogatories, which requested that "Merck explain why it 'hired Terry McBrayer to meet with the Attorney General to discuss settlement of the Commonwealth's KCPA litigation if the Attorney General did not control the litigation.'"  [Record No. 64-1, p. 19 (quoting Def.'s First Reqs., Interrog. No. 9)]  Merck contends that because this interrogatory cited Kentucky Supreme Court Rule 3.130(4.2), which is a professional responsibility rule concerning communications with persons represented by counsel, the AG was alleging "misconduct by Merck's counsel."  [*Id.*]  The Court disagrees.  It appears that by including the reference to the Supreme Court Rule in this interrogatory, the AG was attempting to imply that McBrayer must have believed that Merck was entitled to contact the AG directly.  In other words, the AG used the assumption that McBrayer is an ethical and responsible attorney to add weight to the AG's position that the meeting between McBrayer and the AG indicates a concession on the part of Merck that the AG has retained ultimate authority over the *Merck I* action.  The Court rejects Merck's convoluted reading of the AG's interrogatory.

-12-

the contingency-fee arrangement in this case.  *See Santa Clara*, 235 P.3d at 41 (permitting the public entities to revise their respective contingency-fee contracts to conform with the requirements set out in the opinion).  This is because Merck's claims are based on the ongoing violation of its due process rights — a permanent injunction is not appropriate if the alleged constitutional violation is not "continuing."  *Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010); *see Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) ("A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law.").  Thus, the AG's failure to include a provision concerning direct contact in the Original Contract is not dispositive.  Because the Current Contract specifically provides that "Merck can contact the Office of the Attorney General or his designee at any time" [Record No. 64-16, p. 5], Merck's argument on this point is unavailing.

Merck also asserts that the contingency-fee contracts are "deficient with respect to the division of responsibilities."  [Record No. 64-1, p. 19] On this point, Merck places a great deal of emphasis on the *Santa Clara* court's statement that contingency-fee agreements between public entities and private counsel "must contain specific provisions delineating the proper division of responsibility between the public and private attorneys."  235 P.3d at 37 n.13.  Merck maintains that "the contracts do not appear to 'divide' responsibilities at all, but rather vest responsibility for the 'lead role' of the litigation . . . in outside counsel."  [Record No. 64-1, p. 19]  The Court finds that Merck's reliance on the "division of responsibility" language from *Santa Clara* is misplaced.

-13-

Merck objects to the contracts' omission of "any mention of the AG Office's day-to-day responsibilities."  [*Id.*, p. 20]  However, this argument is based on misunderstanding of *Santa Clara*.  There, the court specified that

> contingent-fee agreements between public entities and private counsel must contain specific provisions delineating the proper division of responsibility between the public and private attorneys.  Specifically, those contractual provisions must provide explicitly that all critical discretionary decisions will be made by public attorneys — most notably, any decision regarding the ultimate disposition of the case.  These contractual provisions reinforce the principle that the financial assistance provided by contingent-fee counsel is conditioned on the understanding that public counsel will retain full control over the litigation and, in exercising that control, must and will place their duty to serve the public interest in ensuring a fair and just proceeding above their sense of any obligation to maximize a monetary recovery for the private attorneys.

235 P.3d at 37 n.13.  In context, the "division of responsibility" language is used as a reiteration of the control-of-litigation principles outlined in *Lead Industries*, rather than creating a separate, additional requirement for due process.  Thus, the contingency-fee contracts need not lay out the specific daily duties that each party to the contract must undertake.

Further, such language would be unnecessary and even potentially counterproductive. The AG argues that because the contracts expressly reserve the AG's authority over the litigation in all respects, he "cannot confer on himself more control of the litigation by binding himself to specific contractual provisions."  [Record No. 72, p. 16]  Indeed, a requirement that the contract set out specific duties for the AG would tend to undermine the principles of neutrality because, on a practical level, specifically delineating the AG's areas of responsibility would cabin his authority, not expand or preserve it.  The Court finds that the Current Contract is not incompatible with the principles expressed in *Santa Clara*, as it includes sufficient descriptions

-14-

of the AG's and private counsel's respective responsibilities regarding the direction of the litigation as a whole.  [*See* Record No. 64-16, pp. 5-6.]

Merck objects to the contractual language requiring outside counsel to assume a "lead role in investigating and . . . preparing [the] litigation."  [*Id.*, p. 6] It argues that this provision "undermines the protection ostensibly created by the contracts' language generically reserving rights 'to direct the litigation in all respects.'"  [Record No. 71, p. 6 n.2]  The Court does not agree that the phrase "lead role" negates the express contractual reservation of the AG's authority over *Merck I.*  If neither contract contained any language concerning the AG's retention of authority to direct the litigation, the "lead role" provision might be problematic.  However, read in context, it appears that this phrase is intended to convey that outside counsel is expected "to take on a very substantial burden in terms of the amount of work that had to be done to pursue [the] litigation."  [Record No. 77-1, p. 189]  Moreover, other courts have recognized the validity of contingency-fee arrangements despite similarly broad delegations of responsibility.  For instance, the retainer agreement in *Lead Industries* directed outside counsel to "diligently and forcefully prosecute all claims which, in their judgment, should be asserted," and conferred "full authority and responsibility for all case management, trial strategy and other decisions necessary or incident to the necessary prosecution of the claims."  *State v. Lead Industries Ass'n*, 898 A.2d 1234, 1235 n.4 (R.I. 2006).[5]  Here, the contracts' use of the phrase "lead role" does not constitute an unlawful delegation of public authority.  Therefore, the Court

---

5       In its 2008 opinion on the constitutionality of the contingency-fee arrangement, the Rhode Island Supreme Court referred to this earlier opinion, in which "[p]ertinent portions of the contingent fee agreement between the Attorney General and Contingent Fee Counsel are set forth extensively."  *Lead Indus.*, 951 A.2d at 469 n.34 (citing *Lead Indus.*, 898 A.2d at 1235-36 n.4).

concludes that the contracts adequately provide that outside counsel will "serve in a subordinate role." *Lead Indus.*, 951 A.2d at 476.

Merck also maintains that the contracts are insufficient because "neither includes language ensuring that the decision to resolve the litigation is left exclusively to the discretion of the AG's office." [Record No. 64-1, p. 20 (internal quotation marks and emphasis omitted); *see also* Record No. 71, p. 6 n.2] However, the Current Contract explicitly provides that the "litigation may be . . . settled, approved, and ended only with the express approval and signature of the Attorney General." [Record No. 64-16, p. 5] As a result, the Court rejects Merck's argument on this point.

Finally, Merck argues that the contracts fail to provide for the "personal involvement of the AG's office in 'all stages of litigation.'" [Record No. 64-1, p. 20 (quoting *Lead Indus.*, 951 A.2d at 477)] This argument is also unpersuasive. The Current Contract directs outside counsel to "coordinate the provision of the legal services with the Attorney General or his designated assistant" and contains express provisions concerning the review of all "substantive pleadings, motions, briefs, and other material which may be filed with the court." [Record No. 64-16, p. 5] Additionally, the Current Contract provides that the AG "must approve in advance all aspects of this litigation." [*Id.*] The Current Contract contemplates the involvement of the AG's office in the proceedings, and thus ensures "that a government attorney with supervisory authority [will] be personally involved in overseeing the litigation." *Santa Clara*, 235 P.3d at 40.

This conclusion is supported by a decision from this circuit. In *Sherwin-Williams Co. v. City of Columbus, Ohio*, No. C2-06-829, 2007 WL 2079774 (S.D. Ohio July 18, 2007), the

-16-

district court considered three contingency-fee agreements between private counsel and various Ohio cities.  The court concluded that the following contractual language passed constitutional muster by "properly vest[ing] in the City Attorney control over the litigation and the sole authority to authorize any settlement of any claim," *id.* at *1:

> [Outside counsel's] services will be coordinated with the City Attorney, who shall retain control over the litigation, with the LLG working under the direction and discretion of the City.
>
> [Outside counsel] hereby agrees that the City Attorney retains the sole authority to authorize any settlement of any claim or complaint made or defended on behalf of the City of [Lancaster].

*Id.*

Similarly, the Court finds that the contracts in *Merck I* contain sufficient safeguards against the violation of Merck's due process rights.  For the reasons explained above, the contingency-fee agreement expressly retains the AG's "complete control over the course and conduct of the case," as well as his "veto power over any decisions made by outside counsel." *Santa Clara*, 235 P.3d at 40.  Additionally, the Current Contract provides that an attorney from the AG's office will be personally involved in overseeing the litigation.  Merck is not entitled to summary judgment on this issue.

### B.    Actual Control

Although the contract between the AG and his outside counsel contains adequate protections, the contingency-fee arrangement may still violate Merck's due process rights if the AG has failed to exercise "absolute and total control over all critical decision-making" in the *Merck I* litigation.  *Lead Indus.*, 951 A.2d at 475 (emphasis omitted).  In other words, despite the

-17-

contractual language, the requirement of neutrality would be violated if the AG allowed outside counsel to overstep their grant of authority under the contract.  Thus, the Court must determine whether the contingency-fee counsel "exceed[ed] reasonable limits of a private attorney performing a prosecutorial function."  *Philip Morris Inc. v. Glendening*, 709 A.2d 1230, 1244 (Md. Ct. App. 1998).  While Merck argues that the facts establish a lack of control on the part of the AG – or at least the appearance of that lack of control – the AG contends that there is no evidence that he "either ceded control or allowed outside counsel to invade the so-called sphere of control in the state litigation."  [Record No. 65-1, p. 1]

Merck has the burden to demonstrate that the AG abdicated his authority to private counsel.  As discussed by the *Santa Clara* court, "attorneys are presumed to comport themselves with ethical integrity and to abide by all rules of professional conduct."  *Santa Clara*, 235 P.3d at 38.  The AG, as "the chief law officer of the Commonwealth," KRS § 15.020, acts as the "attorney for the people of the State of Kentucky."  *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 173 (Ky. 2009).  As such, he is entitled to a presumption that he is pursuing the *Merck I* action in a manner consistent with his duty to seek justice as well as his ethical and professional obligations to the Commonwealth of Kentucky.  As a result, this Court will "presume that the government attorneys will honor their obligation to place the interests of their client above the personal, pecuniary interest of the subordinate private counsel they have hired."  *Santa Clara*, 235 P.3d at 38.

### 1. Knowledge

Both parties rely heavily on the deposition of Assistant Attorney General Elizabeth Natter in support of their arguments. Natter works in the Office of Consumer Protection at the AG's Office and is the lead attorney in the *Merck I* litigation. [Record No. 77-1, p. 26] Merck maintains that Natter "knows next to nothing about the substance of [the AG's] claims against Merck or how . . . [outside] counsel plan to prosecute those claims at trial." [Record No.64-1, p. 2] It argues that Natter's deposition testimony confirms that "the Kentucky AG is not in control of the state-court litigation." [*Id.*, p. 1 (emphasis omitted)]

Merck's argument essentially boils down to the following statement: "the AG's office cannot control critical decision-making when it knows virtually nothing about the lawsuit it is supposed to be directing."[6] [Record No. 64-1, p. 21] Although a complete lack of familiarity with the *Merck I* litigation would tend to indicate a lack of control on the part of the AG's Office, Merck appears to be stretching this concept to an illogical extreme. For instance, Merck contends that Natter's "overall participation in [the MDL] proceedings was so insubstantial that she had to admit that her recall of the entire MDL phase of the litigation is 'fuzzy.'" [Record No. 64-1, p. 23] However, as the AG points out, Natter was explaining her "degree of

---

6       Merck repeatedly chides the AG for his "lack of preparation in the early phases of the KCPA litigation." [Record No. 71, p. 10] It contends that the AG's office "did not develop meaningful, substantive familiarity with its suit at any point prior to the retention of outside counsel." [*Id.*] The Court fails to see why this point should support Merck's motion for summary judgment in this case. Merck appears to suggest that it would be entitled to enjoin the AG from bringing a consumer protection action against it, even if no private counsel were retained, if he relied on an investigation undertaken in another state or the pleadings prepared by that state's attorney general. While such a lackadaisical approach to a civil prosecution would certainly not be advisable, it is difficult to identify the constitutional violation created by a lazy enforcement action. Although the AG's familiarity with his suit — or lack thereof — may be evidence that points to the relative amount of control he has exercised over the *Merck I* litigation, the Court does not accept Merck's implied argument that the AG's less-than-ideal initiation of the lawsuit supports a finding that he delegated his public authority to private attorneys retained well after the action was underway.

preparation" for the deposition when she made this statement.  [Record No. 72, p. 11]  Even if her comment was in direct response to a question about her recall of the MDL events, her testimony does not demonstrate a lack of oversight during that period.  Her exact statement was: "I reviewed some of those e-mails particularly during the time of the MDL, which I did not have — it's two years ago and so I . . . noticed that my recollection was fuzzy, so I went back and reviewed some materials from that time period."  [Record No. 77-1, p. 18]  This testimony does not suggest an unreasonable lack of knowledge concerning the underlying case.  The issue of control cannot hinge on an individual's recall of events or facts from a proceeding that took place years in the past.  If that were the rule, then it would become nearly impossible for a public entity ever to establish that its use of contingency-fee counsel is constitutional.

The Court rejects Merck's assertion that knowledge alone is a reliable indicia of control.  As the AG correctly points out, knowledge and control are distinct concepts, "and an attorney can control litigation without knowing every detail of the case"  [Record No. 80, p. 11] Evidence of the AG office's lack of knowledge would have to be nearly overwhelming for the Court to grant summary judgment to Merck on that basis.  The Court does find it troubling that Natter testified that she did not know if expert witnesses had been retained in the *Merck I* litigation.  [Record No. 77-1, p. 306]  However, Natter's unwillingness to make a definitive statement while testifying under oath on a topic about which she was uncertain is not proof that she has abdicated her responsibility for the underlying action.

And despite performing poorly on a few "pop quizzes" during her deposition, Natter demonstrated her general familiarity with the *Merck I* litigation.  She gave a clear and succinct

narrative of the charges against Merck, the time line of the KCPA enforcement action, and that action's relationship with other similar proceedings. [*Id.*, pp. 115-17] Her inability to remember the specifics of various clinical trials that were cited in the *Merck I* Complaint do not undercut this conclusion.[7]  To the extent that her knowledge and recall are indicative of her control over the underlying litigation in this matter, Natter demonstrated a sufficient familiarity with those proceedings, consistent with her role as the supervising Assistant Attorney General in the case. [*See, e.g., id.*, pp. 115-17 (providing narrative of *Merck I* cause of action); *id.*, pp. 203-04 (discussing discovery schedule in MDL); *id.*, pp. 285-87 (describing negotiation process for NAMFCU Settlement)] In short, Natter's lack of detailed recollections concerning the substance of the *Merck I* litigation does not constitute sufficient evidence that she failed to exert an adequate level of control over the action.

### 2.   Involvement

The AG asserts that his office has been "personally involved in all stages of the litigation." *Lead Indus.*, 951 A.2d at 477.  According to Merck, however, the AG's failure to make substantive revisions to several of the Commonwealth's discovery responses constitutes evidence that "essential decisions in that case are controlled by outside counsel, not the AG's

---

7       Merck makes much of the fact that Natter did not recall the details of "Study 090."  [Record No. Record No. 64-1, p. 5]  However, the following exchange clarifies that this lack of recall at the deposition does not necessarily indicate that Natter failed to investigate the claims made in the *Merck I* Complaint:

    Q       Do you believe you knew the — these salient facts regarding Study 090 prior to the time the complaint was filed?

    A       I believe I did.  I believe I knew the basis for the allegations in the complaint, but I also had assistance from Tad Thomas who was familiar with Vioxx, so . . .

[Record No. 77-1, p. 149-50]

-21-

office." [Record No. 64-1, p. 12]  Merck argues that neither Natter nor anyone else at the AG's Office "offer[ed] any substantive revisions on outside counsel's proposed witness list." [Record No. 64-1, p. 23]  Additionally, it asserts that Natter "did not testify that she made any substantive contributions to the remand motion" and that she "did not make substantive revisions to discovery responses." [Record No. 71, pp. 12-13]  The AG contests the accuracy of Merck's contentions, and argues that Merck has failed to establish, as a matter of law, that the AG was deficient in his duty to review and direct the actions of contingency-fee counsel.

Merck asserts that the AG's office was uninvolved in the preparation of two witness lists. It is true that Natter could not specifically identify each person on the AG's initial list of twelve witnesses or describe "what way they were involved in Merck's coordinated campaign to conceal the dangers of Vioxx." [Record No. 77-1, p. 240]  However, Natter testified that she discussed with outside counsel the "methodology for coming up with names" for the list. [*Id.*, p. 238]  Specifically, she stated: "I did not ask in detail about each [witness].  I wanted to know who they were and why they were on our list, but not . . . which part of Merck did this one work for." [*Id.*, p. 245]  With respect to the AG's good faith witness list, Natter was only able to identify the specific role of seven out of the 65 witnesses listed.  She testified that she "called the drafter of this list to have a discussion about it . . . prior to [] approving it and filing it." [*Id.*, p. 249]  Natter again asserted that she only needed to know why the person was on the list, not the details about that person.  For the reasons explained above, Natter's lack of substantive knowledge regarding the witnesses on the list is not a sufficient basis for the conclusion that she failed to control the procedure by which the lists were created and approved.

-22-

Merck's most compelling argument concerns the list of 45 claimed violations of the KCPA.  As explained previously, the complaint in *Merck I* seeks the maximum civil penalties recoverable under the KCPA: "two thousand dollars ($2,000) for each violation of KRS 367.170, and ten thousand dollars ($10,000) for each violation targeted to consumers over the age of 65." [Record No. 2-2, p. 8]  In response to Merck's interrogatory, the AG provided a list of 45 alleged violations for which it will seek these penalties.  [Record No. 64-19]  Merck asserts that this list was compiled by outside counsel and argues that "outside counsel in this case have attempted to multiply the number of alleged KCPA violations in order to maximize their potential recovery."  [Record No. 64-1, p. 22]  It also points out that the "list is identical to the one produced by the same outside counsel on behalf of the State of Alaska, making it clear that the AG had no input in developing it."  [*Id.*]

The Court agrees that the AG's approval and use of the KCPA violations list suggests a disappointingly casual approach to the details of the *Merck I* proceeding.  Natter testified that she has "not reviewed [the] entire set of documents" upon which the list of violations is based. [Record No. 77-1, p. 269]  Additionally, when asked if outside counsel prepared the list, Natter stated: "I am not 100 percent sure of the source of this list.  I believe they prepared it, but it could have been an exhibit from other litigation."  [*Id.*, p. 266]  Considering the fact that this list — or, at least, the final version of this list — will form the basis for the Commonwealth's requested recovery, this uncertainty and unfamiliarity are disconcerting.

However, the Court will not go so far as to conclude that the use of this list without alteration establishes that the AG has ceded his authority to private counsel.  Natter testified that

-23-

she discussed with outside counsel "how the Kentucky Consumer Act applies" to Vioxx to assist them in identifying KCPA violations.  [*Id.*, p. 267]  Additionally, she stated that she was generally familiar with the documents that form the basis for the list of violations, and she averred that she "did not need to review them in detail in order to make [the] determination" to approve the list.  [*Id.*, p. 277]  The AG, through Natter, had the right and the authority to reject or change the list of KCPA violations.  The fact that she did not do so may be proof of complacency or laziness, but not necessarily the absence of control.

Merck has essentially attempted to graft a "substantive" requirement onto the control-of-litigation principles outlined in *Lead Industries* and *Santa Clara*.  The Court refuses to apply this heightened standard to the AG's contingency-fee arrangement.  To find that the failure to make "substantive revisions" indicates a lack of oversight or control, the Court would be required to inquire into the daily litigation efforts of the AG, which in turn raises thorny issues of privilege. Moreover, the standard would be extremely difficult to apply.  If the complete absence of revisions to a given document is probative evidence of the AG's failure to exercise meaningful control over the action, then how many revisions would suffice?  Would this apply to every court filing and discovery response or only the most important ones?  If only the important filings, how does the Court define importance in this context?  Without a bright-line rule, such questions would overwhelm the Court's common-sense analysis.  Yet the adoption of a bright-line rule would undoubtedly have a chilling effect on the AG's ability to prosecute civil enforcement actions in the future.  Moreover, requiring "substantive revisions" ignores the possibility that the AG, or his representative, may simply be satisfied by the outside counsel's work product.  The

Court declines to adopt a rule that would have such potential to lead to bizarre and unnecessary hoop-jumping by the AG.

There is no constitutional requirement that the AG's office be involved in any particular hands-on work in the litigation, as long as he retains control over the critical decisions in the case. Lack of involvement in the legwork of a case does not prove or even imply a lack of control. The legal system would cease to function efficiently if the person with ultimate control over a case was required not only to oversee and approve all the actions taken in the matter, but also take part in every minute detail of those actions. The AG need not be involved in the day-to-day work done in all the cases being prosecuted by his office. Indeed, it would be virtually impossible for him to do so. It is similarly illogical to require Natter to take part in the in-depth work that the contingency-fee counsel was hired to do. This would not only be too onerous a standard for "maintaining control over the litigation," it would also defeat the purpose of hiring outside counsel to begin with.

In summary, the Court concludes that the AG's office does not need to be intimately involved in all of the everyday work or decision-making that occurs in the *Merck I* litigation to exercise meaningful control over the proceedings. The *Lead Industries* court recognized that "in the course of litigation in which contingent fee counsel is involved, certain decisions of the 'de minimis' or ministerial variety will from time to time have to be made. Regarding who should make such relatively petty decisions, pragmatism rather than rigidity should be the watchword." 951 A.2d at 476 n.51 (noting that "when there is doubt as to who should make a particular decisions, the 'close calls' should be made in favor of the decisional authority of the Attorney

General.").  The AG's involvement in de minimus work efforts, such as document review and drafting, is not necessary to "safeguard against the possibility that private attorneys unilaterally will engage in inappropriate prosecutorial strategy and tactics geared to maximize their monetary reward." *Santa Clara*, 235 P.3d at 38-39.

As long as the AG's office is reviewing the contingency-fee counsel's work before adopting or approving it — and Merck has cited no evidence in the record to convince the Court that it is not — the AG has retained and exercised his decisional authority.  The Court will not second-guess the AG's decision to grant a certain amount of "room for the outside attorneys to . . . exercise their professional skills in putting a lot of [the litigation] together." [Record No. 77-1, pp. 317-18]  Because these decisions are "generally internal to the preparation of the litigation" and the AG does not allow outside counsel to dictate the direction or goals of the action, the arrangement has not violated Merck's due process rights.  [*Id.*, pp. 321-22]

Natter testified that she has engaged in "regular communication by telephone with outside counsel from the beginning when they were retained" in addition to "regular e-mail communication and . . . a weekly conference call."[8] [*Id.*, pp. 309-10]  She estimated that she has spent between 80 and 95 percent of her time on the *Merck I* litigation since the case was remanded back to the Franklin Circuit Court. [*Id.*, p. 34]  Additionally, she stated that the AG's office reviews any documents that are filed with the Court, making changes and adding

---

8       Indeed, Natter tallied her email communications with outside counsel to "convey the volume of communications." [Record No. 77-1, p. 310]  From August 2010 to March 2011, she sent outside counsel a total of 144 emails; from March 2011 to January 2012, she emailed them more than 192 times; and from January 2012 until the deposition on November 27, 2012, she had sent a total of 722 emails to the AG's retained counsel.  [*Id.*, pp. 311-12 (noting that these numbers represent the total number of emails sent and that Natter did not "make any effort to weed out nonsubstantive e-mails")]

arguments when necessary to "ensure that positions and briefs are consistent with the positions of the [AG's] office." [*Id.*, p. 196] Regarding discovery responses, Natter testified that she "take[s] an active role in editing and drafting, but . . . there's certainly a team effort and there is a division of labor. For example, outside counsel takes the lead role in document review" [*Id.*, p. 197] This description of the respective duties of the AG's office and outside counsel is consistent with the principles discussed in *Lead Industries* and *Santa Clara*. Therefore, the Court concludes that the AG's failure to make "substantive revisions" to a handful of important documents does not qualify as a demonstration of his failure to control the actions of contingency-fee counsel or the course of the *Merck I* proceedings.

### 3. Settlement Authority

Merck also asserts that the AG has abdicated his settlement authority to outside counsel. The facts regarding the rejection of the settlement offer negotiated by the National Association of Medicaid Fraud Units ("NAMFCU") are essentially undisputed, although the parties differ regarding the weight that should be given to this evidence. The letter officially declining the settlement offer was prepared on outside counsel's letterhead and signed by Brian Vines, a private attorney. No attorneys at the AG's office were copied on the letter. [Record No. 71-9, pp. 2-3] Merck contends that this letter "offers significant circumstantial evidence that the AG was not involved in the decision to decline the offer." [Record No. 71, p. 16] The AG counters that Merck has failed to carry its burden of proof on this point.

Natter's testimony establishes that the letter was sent at the behest of the AG. She explained that the NAMFCU settlement required states to release their consumer protection

claims as a condition for receiving payment under the settlement terms.  [Record No. 77-1, pp. 288-89]  Because of this apparently unusual arrangement, the AG's office engaged in numerous discussions regarding the settlement, concluding that they "did not consider [the settlement] to be a fair and reasonable offer."  [*Id.*, p. 290]  Natter testified as follows:

> We met with outside counsel.  We discussed the case and that offer.  After that, Dana [Nichols, Assistant Deputy Attorney General,] spoke with the chief deputy, who at the time was Patrick Hughes, and I received an e-mail from Dana later that day stating that we were turning down the NAMFCU settlement unless the CP claims were not included in the release of that document and . . . conveying authorization to Mr. Garmer for settlement because we took the mediation very seriously.  So we conveyed a specific authorization and had the chief deputy available by phone who could get in touch with the AG, if needed, if . . . it came up during the mediation.

[*Id.*, p. 289]  Outside counsel was directed to reject the settlement offer, and they did so during the mediation with Merck.  [*Id.*, pp. 293-94]  After the mediation, on August 1, 2011, outside counsel sent a formal rejection letter to Merck.  [Record No. 71-9]

The fact that "no attorney from the AG's office had even seen the letter declining Merck's settlement offer" is not inconsistent with the events described by Natter in her deposition.  [Record No. 71, p. 16]  The AG directed outside counsel to prepare and send the letter; he did not need to request a copy, although that certainly would be a recommended practice, if only for record-keeping purposes.  The AG is entitled to rely on his outside counsel to implement his directions without varying from his explicit instructions.  His decision to trust his retained attorneys to carry out his directions honestly and forthrightly does not amount to a abdication of authority to those attorneys.  The Court rejects Merck's argument that Natter's admission that "no attorney from the AG's office saw the letter before it was sent . . . [is] more

-28-

than sufficient to prove that the AG did not exercise sufficient control over the settlement decision." [*Id.*, p. 17]

The contingency-fee contract expressly retains the AG's final authority over the decision to settle and provides that any settlement must be expressly approved and signed by the AG. [Record No. 64-16, p. 5]  Merck's own attorney, Terry McBrayer, acknowledged the AG's authority over settlement matters when he testified that "it takes his signature to approve the settlement.  If he doesn't sign it, it doesn't happen."  [Record No. 65-3, p. 33]  And none of the evidence in the record leads the Court to the conclusion that the AG allowed outside counsel to usurp his settlement authority in *Merck I*.  Accordingly, the Court rejects Merck's argument on this issue.

### 4.      Appearance of Control

The AG must "appear to the citizenry of [Kentucky] and to the world at large to be exercising [] control" over all stages of the litigation.  *Lead Indus.*, 951 A.2d at 477.  Merck contends that there was "almost no personal involvement by the AG's office" during the time that *Merck I* was pending in the federal Vioxx MDL proceeding.  [Record No. 64-1, p. 22]  It argues that Natter "only appeared telephonically at 'some' MDL status conferences, and that she never spoke on the record, other than to introduce herself to the court."  [Record No. 71, p. 12 n.8]  Additionally, Merck argues that the AG's office "abdicated control of the litigation to its outside counsel" because the MDL briefs were submitted by outside counsel and letters to the MDL court were submitted on Garmer & Prather letterhead.  [Record No. 64-1, p. 9; *see* Record Nos. 64-9, 64-10]

It is well-established that "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). However, the Court will not mechanically apply the "appearance of control" language from *Lead Industries*. The AG was acting within his statutory authority when he retained outside counsel, and he followed the proper procedures in doing so. *See* KRS §§ 15.100(3), 45A.695. Because the "Request for Proposals" process was transparent and the contingency-fee contracts are a matter of public record, the AG's appearance of control is not as a great a concern as it might be under different circumstances. *See Glendening*, 709 A.2d at 1243 (distinguishing *Clancy* on the grounds that Maryland has a "legislative enactment authorizing the 'special employment' of outside counsel" while California does not).

Merck is not entitled to summary judgment based on the AG's lack of public appearances during the Vioxx MDL. MDL proceedings are vast, complex actions, which are generally litigated some distance away from the jurisdictions where the member cases were originally filed. By necessity, the involvement of many parties' original counsel is minimal and attorneys generally rely on their leadership committees to represent and advise them. [*See* Record No. 77-1, p. 178 ("We worked mostly through the government plaintiff steering committee and Dawn Barrios, the plaintiffs' liaison counsel for the state government plaintiffs.")] Moreover, the original purpose of retaining outside counsel in *Merck I* was to remove the burden on the AG's office of having to litigate the action in such complex and distant proceedings.[9] Therefore, Natter's relative lack of personal appearances before the MDL court does not support the

---

9       When discussing the reason for engaging outside counsel, Natter stated that the "state budget did not permit [the AG's office] easily to attend meetings in the MDL and to get to the MDL. The MDL . . . had been in existence a long time and we were being required to respond to requests that we were not yet as familiar with as the other states that were involved." [Record No. 77-1, p. 167]

conclusion that the AG's office failed to exert control over the *Merck I* litigation during its pendency in the Vioxx MDL.

Similarly, the fact that the majority of the letters and briefs submitted to the MDL court were signed by outside counsel is insufficient proof that the AG failed to maintain the appearance of control over the proceeding. The contingency-fee attorneys did not represent themselves as having ultimate decision-making authority over the litigation. In their initial notice of appearance before the MDL court, outside counsel stated their intention "to serve as Co-Counsel in the case known as <u>Commonwealth of Kentucky v. Merck & Co.</u>" [Record No. 64-9, p. 15] Further, the contents of the letters submitted by Merck make it clear that outside counsel was acting upon the direction and authorization of the AG. For example, the August 1, 2011 letter to Judge Eldon E. Fallon includes the following statement: "the Commonwealth's lawyers briefed the Attorney General's office on the status of the litigation, received settlement authority, and prepared documents and a position statement to facilitate serious negotiations with Merck." [Record No. 64-10, p. 5] In light of the public contract with outside counsel, the Court finds that the AG's failure to appear in person or to sign the documents submitted to the MDL court did not create the impression that the AG had abdicated his control over the litigation to contingency-fee counsel.

Rather, Natter's testimony establishes that the AG set goals for the MDL and authorized outside counsel to take steps to achieve those goals. She testified as follows:

> So we had one objective, which was to be remanded back to Franklin Circuit and outside counsel was authorized to take action consistent with that objective. They were authorized to assist us in responding to formal discovery. They were authorized to seek informal discovery as requested by the – by the judge and the

> mediator in the MDL as part of that mediation process. And they were authorized to represent us in that mediation process. They were also authorized to speak to the judge and to approach the judge.

[Record No. 77-1, pp. 173-74]  The AG set an objective and outside counsel achieved that objective. Merck has failed to demonstrate that the contingency-fee counsel ever took any action in the MDL that was not approved by the AG's office. Additionally, the AG's office "kept up with what was going on in the MDL" and "participated in the formal discovery." [*Id.*, p. 178] Natter's testimony establishes that the AG retained control over the action during the MDL even though the distance and complexity of the proceeding made it difficult for his office to take an active role in the litigation. Since the action was remanded to Franklin Circuit Court, the AG's office has taken an even more active and conspicuous role in the proceedings. [*Id.*, p. 305] Therefore, the contingency-fee arrangement is "not adverse to the standards that an attorney representing the government must meet."[10] *Lead Indus.*, 951 A.2d at 476.

## V.

Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Merck, as the plaintiff, bears the burden of proof in this action. However, it has failed to establish that the AG relinquished control over the litigation in *Merck I*. The Court concludes that the AG has retained and exercised decision-making authority in the underlying litigation.

---

10    Because the AG is entitled to summary judgment based on the evidence in the record, the Court will not address his argument regarding the need for expert evidence. [*See* Record No. 65-1, pp. 24-25.]

Thus, Merck's due process rights were not violated and the AG is entitled to judgment as a matter of law.  Accordingly, for the reasons discussed above, it is hereby

**ORDERED** as follows:

1.      Plaintiff Merck Sharp & Dohme Corporation's Motion for Summary Judgment [Record No. 64] is **DENIED**.

2.      Defendant Jack Conway's Motion for Summary Judgment [Record No. 65] is **GRANTED**.

3.      Defendant Jack Conway's Motion *in Limine* [Record No. 66] is **DENIED** as moot.

4.      Plaintiff Merck Sharp & Dohme Corporation's Motion to Withdraw Jury Demand [Record No. 89] is **DENIED** as moot.

5.      A separate Judgment will be entered this date in favor of Defendant Jack Conway.

This 24th day of May, 2013.



Signed By:

*Danny C. Reeves* DCR

United States District Judge

-33-